NO. 07-01-0189-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

JANUARY 3, 2002

_____


DR. FRED HAGEDORN, APPELLANT

V.

JAMES TISDALE, APPELLEE


_____

FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2000-509,384; HONORABLE SAM MEDINA, JUDGE

_____

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

The subject matter of this appeal is the trial court's order granting in part and denying in part the motion of appellant Fred Hagedorn, M.D., (Hagedorn) to dismiss appellee James Tisdale's (Tisdale) health care liability claims against him. Both parties have asserted error on appeal. For the reasons set forth below, we modify the judgment of the trial court and, as modified, affirm it.

Tisdale filed a lawsuit on March 15, 2000, alleging medical malpractice on the part of Hagedorn in his treatment of Tisdale in the emergency room after a fall from scaffolding. The claims asserted are health care liability claims pursuant to article 4590i of the Texas Revised Civil Statutes (Vernon Supp. 2001) (the Medical Liability and Insurance Improvement Act).[1]  Tisdale failed to give 60 days pre-suit notice as required by the statute, and the case was therefore abated for 60 days.  Tisdale then filed a written expert report required by the statute on October 2, 2000.  Hagedorn moved to dismiss the lawsuit on the basis the report was filed late and did not constitute a good faith effort to comply with the requirements of the statute.  Prior to a hearing on the motion, Tisdale non-suited his case.  The trial court went ahead and held a hearing on the motion to dismiss and found that the report was not timely filed and did not constitute a good faith effort to meet the requirements of the statute.  Nevertheless, the court only granted Hagedorn's request for attorney's fees and did not dismiss the lawsuit with prejudice, reasoning the entry of the non-suit by Tisdale prevented a dismissal by the court.

Hagedorn's issues are whether the trial court abused its discretion (1) in finding that Tisdale did not timely file his expert report and, if so, whether such a finding required the trial court to dismiss with prejudice, and (2) whether the trial court abused its discretion in finding that the report was not a good faith effort to comply with the statute and, if so, whether such a finding required the trial court to dismiss with prejudice.  In essence,

[1]Later references to section numbers refer to article 4590i of the Revised Civil Statutes unless otherwise specifically denominated.

2

Hagedorn only challenges the portion of the trial court's order which failed to dismiss the lawsuit with prejudice and seeks that we uphold the rest of the order. In contrast, Tisdale claims the trial court erred in even considering and ruling on the motion to dismiss after he had already filed and served his non-suit. He also challenges the finding that the medical expert report was not timely filed, it was not a good faith effort to comply with the statute, as well as the award of attorney's fees in the amount of $11,690.

We will initially consider Tisdale's complaint that the trial court did not have jurisdiction to rule on the motion for dismissal because, prior to the hearing on the same, Tisdale had filed a non-suit. The notice of non-suit was filed on January 11, 2001, eight days before the scheduled hearing on the motion to dismiss. The trial court did not issue its order until April 13, 2001. Tisdale claims that a party has an absolute right to a non-suit at the time a request is filed with the court clerk and that the signing of an order for non-suit is merely a ministerial act. In response to the argument of Hagedorn that Rule 162 of the Rules of Civil Procedure gives the trial court jurisdiction to rule on the motion to dismiss, Tisdale claims that Rule 162 applies only to sanctions imposed under Rule 13 of the Rules of Civil Procedure.

Rule 162 provides in pertinent part:

At any time before the plaintiff has introduced all of his evidence other than rebuttal evidence, the plaintiff may dismiss a case, or take a non-suit, which shall be entered in the minutes. Notice of the dismissal or non-suit shall be served in accordance with Rule 21a on any party who has answered or has been served with process without necessity of court order.

3

> Any dismissal pursuant to this rule shall not prejudice the right of an adverse party to be heard on a pending claim for affirmative relief or excuse the payment of all costs taxed by the clerk. A dismissal under this rule shall have no effect on any motion for sanctions, attorney's fees or other costs, pending at the time of dismissal, as determined by the court.

Tex. R. Civ. P. 162. The comment to the rule states that the purpose of the rule is to fix a definite time after which a party may not voluntarily dismiss or non-suit a cause of action. In addition, any pending motions for sanctions or attorney's fees filed prior to the motion for non-suit or dismissal are not to be disturbed.

Rule 13 provides for the court, either on motion or its own initiative, to impose an appropriate sanction under Rule 215-2b against attorneys or parties who bring fictitious suits as experiments to get an opinion of the court or who file any fictitious pleading for such a purpose or make statements in a pleading which they know to be groundless and false. However, courts may also impose sanctions for other reasons such as abuse of discovery and, as specifically provided by statute such as in article 4590i § 13.01(e), which permits the imposition of "sanctions" in the manner of reasonable attorney's fees and costs of court, the forfeiture of any cost bond, and the dismissal of the action with prejudice to refiling when an expert report has not been furnished in 180 days as required.

Rule 162 does not limit its applicability to any particular type of sanctions or reason for sanctions. In fact, the rule refers to "any motion for sanctions, attorney's fees or other costs." Statutory construction requires that we give effect to the intent of the legislature. *Monsanto Co. v. Cornerstones Mun. Utility Dist.*, 865 S.W.2d 937, 939 (Tex. 1993). If the

4

statutory language is unambiguous, we determine the legislative intent from the plain and common meaning of the words of the statute. *Id.*

In *Tri-M Erectors, Inc. v. Clearwater Constructors, Inc.,* 788 S.W.2d 906 (Tex.App.--Austin 1990, writ denied), the court considered whether the trial court lost jurisdiction to dismiss a suit with prejudice as a discovery sanction when the plaintiff filed its notice of non-suit. The court found that the request for dismissal as a sanction for the failure to attend depositions was pending at the time the non-suit was filed, and therefore, pursuant to Rule 162, the non-suit had no effect on the trial court's power to order the case dismissed with prejudice. *Id.* at 908.

Furthermore, in *Martinez v. Lakshmikanth*, 1 S.W.3d 144 (Tex.App.--Corpus Christi 1999, pet. denied), the trial court considered the interaction between Rule 162 and section 13.01(e) of article 4590i. In that case, the defendants did not file a motion to dismiss with prejudice for failure to timely file the required expert report until after the plaintiffs had filed a notice of non-suit. The court found that section 13.01(e) does not prohibit a plaintiff from taking a non-suit after 180 days had passed. Therefore, the non-suit was proper. The court noted that the defendants could have moved the court to sanction the plaintiffs for not filing their expert report within the 180 days, but chose not to do so until after the non-suit was filed, and therefore waived their right to do so. *Id.* at 149.

Tisdale argues in reliance on *In re Bennett*, 960 S.W.2d 35 (Tex.1997), that Rule 162 applies only to sanctions that do not affect the merits of the underlying transaction.

5

In *Bennett*, the plaintiffs had filed notices of non-suit in 16 previously filed lawsuits, in an attempt to get the claims before a particular judge. The trial judge did not sign an order of non-suit, but instead sua sponte set a hearing on whether sanctions should be imposed against plaintiffs' counsel. Prior to that hearing, the cases were removed to federal court. However, the trial court went ahead and proceeded with the sanctions hearing and ordered plaintiffs' counsel to pay $10,000 each as a sanction. No order of dismissal was ever signed.

Thus, contrary to the facts present before us, no motion for sanctions was pending in *Bennett* at the time the notices of non-suit were filed. While the court noted that the trial court's imposition of sanctions had no bearing on the merits of the case and did not interfere with jurisdiction in federal court, it made no statement as broad as the one argued by Tisdale, *i.e.*, that Rule 162 applies only to sanctions not affecting the merits of the case. *Id.* at 39. The court further noted that the signing of an order dismissing a case, not the filing of a notice of non-suit, determines when the court's plenary power expires. *Id.* at 38. In this instance, Hagedorn filed a motion to dismiss with prejudice prior to the filing of Tisdale's non-suit. We therefore believe that, pursuant to the plain language of Rule 162 and the cited authorities, the trial court had authority to consider and rule on Hagedorn's motion to dismiss. We thus overrule Tisdale's first issue or cross-point.

We will next consider Hagedorn's first issue and Tisdale's second issue or cross-point as to whether the trial court erred in finding that Tisdale did not timely file his medical

6

expert report. Section 13.01(d) of article 4590i provides that not later than the 180th day after the date on which a health care liability claim is filed or the last day of any extended period established under Subsection (f) or (h), the claimant shall, for each physician or health care provider against whom a claim is asserted, furnish to counsel for each physician or health care provider one or more expert reports, with a curriculum vitae of each expert or voluntarily non-suit the action against the physician or health care provider. Article 4590i § 13.01(d)(1) and (2). The court may for good cause shown extend any time period for an additional 30 days. *Id.* § 13.01(f). The parties may also agree to extend the time. *Id.* § 13.01(h). In this instance, neither of those events took place.

As already noted, the claim was filed on March 15, 2000. The parties agree that Tisdale would normally have had until September 11, 2000, to provide his expert report. However, the report was not filed until October 2, 2000. Nevertheless, Tisdale argues that the report was not filed late because the trial court abated the action from April 3, 2000, until June 2, 2000, thereby giving him an additional 60 days to file the report.

Section 4.01 of article 4590i provides:

(a) Any person or his authorized agent asserting a health care liability claim shall give written notice of such claim by certified mail, return receipt requested, to each physician or health care provider against whom such claim is being made at least 60 days before the filing of a suit in any court of this state based upon a health care liability claim.

7

Hagedorn filed a plea in abatement based on Tisdale's failure to comply with this provision. Thereafter, an agreed order of abatement was entered by the court. Tisdale contends the abatement left him with no power to prosecute his claims, and he could not have filed his report during the time of abatement. However, we note that Tisdale still had almost three months after the abatement ended to file his report. Thus, the issue for determination is whether the abatement extended the time period.

Abatement of a cause is the appropriate remedy for a plaintiff's failure to comply with the 60-day notice requirement of section 4.01. *Schepps v. Presbyterian Hosp. Of Dallas*, 652 S.W.2d 934, 938 (Tex. 1983). A number of courts have held that an abatement is a present suspension of all proceedings in a lawsuit. *Campbell v. Kosarek*, 44 S.W.3d 647, 650 (Tex.App.--Dallas 2001, pet. filed); *In re Kimball Hill Homes Texas, Inc.*, 969 S.W.2d 522, 527 (Tex.App.--Houston [14th Dist.] 1998, orig. proceeding); *Permanente Medical Ass'n. of Texas v. Johnson,* 917 S.W.2d 515, 517 (Tex.App.--Waco 1996, orig. proceeding); *Lumbermens Mut. Cas. Co. v. Garza*, 777 S.W.2d 198, 199 (Tex.App.--Corpus Christi 1989, orig. proceeding). Nevertheless, some courts have found it permissible for certain actions to be taken during an abatement, such as the joinder of parties and the dismissal of the cause of action. *See De Checa v. Diagnostic Center Hosp., Inc.,* 852 S.W.2d 935, 938 n.5 (Tex. 1993); *United Oil & Minerals, Inc. v. Costilla Energy, Inc.*, 1 S.W.3d 840, 846 (Tex.App.--Corpus Christi 1999, no pet.).

In this instance, the question before this court is not whether the medical expert report could have been filed during the abatement period, since the report was not due to be filed until some three months after the end of the abatement period, but whether the fact of the abatement period extended the deadline for filing the report by 60 days. In a recent case, the Dallas Court of Appeals has answered the question in the affirmative, relying on its conclusion that since the report could not have been filed during the abatement period, it logically follows that any statutory deadlines are necessarily suspended as well. *Kosarek*, 44 S.W.3d at 650. In that case, the 60-day notice which was not given was one apparently required by the Texas Insurance Code, not the one required by article 4590i. *Id.* at 648.

Similarly, in *Tibbetts v. Gagliardi*, 2 S.W.3d 659 (Tex.App.--Houston [14th Dist.] 1999, pet. denied), a stay required under the Insurance Code upon the receivership of one of the defendant physician's insurance carriers was found to extend the deadline for filing the report. *Id.* at 664. However, the parties had also entered into a Rule 11 agreement to extend the deadline in that case. *Id.*

The Medical Liability and Insurance Improvement Act was enacted to curtail frivolous claims against physicians and other health care providers. Article 4590i § 1.02; *Lakshmikanth*, 1 S.W.3d at 147. The purpose of the 60-day notice provision is to encourage pre-suit negotiations so as to avoid the cost of litigation, *De Checa*, 852 S.W.2d at 938, and the requirement of that notice is mandatory, *Schepps*, 652 S.W.2d at 938. The

9

effect of the abatement is to keep the defendant free of litigation during the abatement period. *See America Online, Inc. v. Williams,* 958 S.W.2d 268, 277 (Tex.App.-- Houston [14th Dist.] 1997, no pet.) (distinguishing between adding other defendants during the abatement period and certifying a class which added thousands of plaintiffs with a claim against a defendant).

We are disturbed by the fact that, if an abatement for failure to give the required notice under the act automatically extends the deadline for filing the medical expert report, a plaintiff would in fact be rewarded with additional time for the filing of his report by his failure to comply with the statutory notice requirement. In other words, a health care provider would be placed in the position of having to choose whether to seek an abatement for the failure of the plaintiff to give him the statutorily required 60-day notice or to hold the plaintiff to the statutorily required deadline for filing the expert report. We cannot believe that the intent of the legislature to discourage frivolous lawsuits and encourage settlement of claims would be served by such a construction, since the legislature has determined that failing to timely file an expert report means that the claim is either frivolous or at best has been prematurely brought. *See American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

Moreover, we fail to see how the claimant is damaged by being required to adhere to the statutory requirement. The plaintiff to some extent chooses when to file his lawsuit and, at the time of filing, knows he has 180 days to file his expert medical report. The trial

10

court also has authority to extend the deadline for an additional 30 days upon a showing of good cause or that the failure of a claimant's attorney to file the report was the result of an accident or mistake. Article 4590i § 13.01(f) and (g). Without reaching a decision as to whether a medical expert report could be filed during the abatement period if the 180-day deadline occurred during that time, or the effect of a stay mandated under some other provision of the Texas statutes, we believe that, under the facts before us, the medical expert report was untimely filed. Thus, we sustain Hagedorn's first issue and overrule Tisdale's second issue.

In his third issue or cross-point, Tisdale argues that the trial court erred in concluding that the expert report of Dr. Michael A. Mitchell did not constitute a good faith effort to comply with the requirements of article 4590i. In opposition, Hagedorn asserts in his second issue that the trial court did not err in its conclusion. We review the trial court's ruling under an abuse of discretion standard. *Palacios*, 46 S.W.3d at 878. That test is whether the trial court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operator, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

A trial court may grant a motion challenging the adequacy of an expert report only if it appears, after hearing, that the report does not constitute a good faith effort to comply with the definition of an expert report. Article 4590i § 13.01(l). An "expert report" is defined as "a written report by an expert that provides a fair summary of the expert's

11

opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). While the report does not have to present all the plaintiff's proof, it must include the expert's opinion on each of the elements identified in the statute. *Palacios*, 46 S.W.3d at 878. The report must inform the defendant of the specific conduct being questioned and provide a basis for the trial court to conclude the claims have merit. *Id.* at 879. A report that merely states conclusions about the standard of care, breach, and causation is not sufficient. *Id.* Nevertheless, the report does not have to meet the same requirements as the evidence offered in support of a summary judgment proceeding or at trial. *Id.*

One basis upon which Hagedorn attacked the report was that it failed to show Dr. Mitchell's qualifications. A person may qualify as an expert witness on the issue of whether a physician departed from accepted standards of medical care only if the person is a physician who (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose, (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, and (3) is qualified on the basis of training or experience to offer an expert opinion regarding the accepted standards of medical care. Article 4590i § 14.01(a). In determining whether the expert is qualified on the basis of training or experience, the court is to consider whether, at the time the claim arose or the testimony is given, the

12

witness is board certified or has other substantial training or experience in an area of practice relevant to the claim and is actively practicing medicine in rendering medical care services relevant to the claim. *Id.* § 14.01(c).

Tisdale was treated in the emergency room of University Medical Center by Hagedorn after falling about six feet off a scaffold. Hagedorn ordered x-rays of the spine, chest and pelvis, which showed bone spurs in the spine, but no fractures or abnormalities in the chest. Tisdale's wounds were cleaned and sutured. At the time he was to be discharged, he complained of the inability to move his legs. Hagedorn then ordered a CT scan of the neck and head and a cervical MRI was also performed, which showed a contusion and swelling of the spinal cord. Tisdale underwent surgery and claims he is now a quadriplegic.

Hagedorn argues that neither Dr. Mitchell's report or his curriculum vitae show the requisite knowledge of accepted standards of medical care for the diagnosis, care, or treatment of a suspected spinal cord injury due to a fall or the qualifications to express an opinion on causation. Specifically, it fails to show any training or experience in rendering emergency medical care in general or emergency care for a suspected spinal cord injury.

In response, Tisdale claims that Dr. Mitchell is board certified in family medicine and geriatrics and is certified as an instructor in advanced trauma life support and advanced pediatric life support. He is also supervising physician/medical director at a rural health clinic in Holliday, Texas. Tisdale further points to Dr. Mitchell's years of private practice

13

in medicine and his period of employment as medical director at the Oklahoma Department of Corrections. He posits that we should focus on the condition involved in the claim, rather than Dr. Mitchell's particular area of expertise.

Every licensed doctor is not automatically qualified to testify as an expert on every medical question. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996). On the other hand, the fact that an expert is not a specialist in the particular branch of the profession for which the testimony is offered will not automatically disqualify him as an expert. *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex.App.--Houston [14th Dist.] 1999, no pet.). The issue is the specific subject matter and the expert's familiarity with it. *See Heise*, 924 S.W.2d at 153; *Ali*, 7 S.W.3d at 745. As already noted, there are specific criteria to be met under the Medical Liability and Insurance Improvement Act for an expert to testify as to whether a physician departed from accepted standards of medical care.

Applying those criteria to Dr. Mitchell, it appears from his resume that he was practicing medicine both at the time the report was prepared and at the time the claim arose; however, that practice appears to be a general one. The only indication that he has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the injury sustained is his certification in advanced trauma life support and his statement that a failure to palpate the neck following negative x-rays and to maintain in-line mobilization while doing so will result in immediate failure in advanced trauma life support training. There is no indication Dr. Mitchell has ever practiced in emergency medicine,

14

trauma, or the treatment of spinal injuries, and he does not state that he has knowledge of the accepted standards of medical care for the diagnosis, care and treatment of traumatic spinal injuries.

Even if Dr. Mitchell's qualifications were sufficient, Hagedorn also challenges Dr. Mitchell's report on the basis that it does not represent a good faith effort to provide a fair summary of the standard of care, breach, and causation. In his report, Dr. Mitchell is critical of Hagedorn in several areas: 1) removal of stabilization devices, 2) prescribing Valium and Demerol, 3) the failure to make a neurological evaluation or if one was made to document it, and 4) the delay in re-evaluating the patient for 25 minutes after being notified that he could not move his legs. For each of these complaints, Dr. Mitchell was required to state the standard of care, identify the breach of that standard, and demonstrate causation.

Dr. Mitchell opined that Tisdale's "condition was worsened by having stabilization devices removed before they should have been removed." The standard of care was arguably described in the following excerpt:

> Palpation of the neck for tenderness should be done following negative x-ray examination. In-line stabilization is maintained while the cervical spine is palpated for tenderness, spasm or deformity. Failing to perform this is criteria for immediate failure in Advanced Trauma Life Support training. Immobilization is also maintained in some manner during palpation of the thoracic and lumbar spine.

15

However, Dr. Mitchell asserts that, "[b]y the record, I must assume that Mr. Tisdale's immobilization devices were removed early on in his evaluation." Even though Dr. Mitchell opines that the condition was worsened by the stabilization devices being removed before they should have, he is not able to say when they were removed and only "assumes" they were removed early. He also claims that at the time of admission to the emergency room, the patient only complained of pain in his legs, and therefore "[s]omething must have happened in the intervening period of time to produce the paresis" and, in his opinion, that occurred due to "the immobilization devices being removed and the patient being moved around repeatedly over a rather extended period of time." This opinion is based on one assumption or conclusion built upon another, which is not sufficient to show a breach of the standard of care. He also fails to state how the immobilization would have prevented or impeded the bleeding and swelling from a contusion.

With respect to the prescribing of Valium and Demerol, Dr. Mitchell states the following:

> I also believe that the ER physician strayed from the standard of care in giving Valium twice while in x-ray. This medication could potentially have covered up muscle spasms or subtle strength differences, which may have been important findings in leading the physician to the conclusion that a neurological injury probably existed. Demerol would have further compromised the ongoing exam by covering up both pain and spasms. These meds should not have been given until it was reasonably certain that no neurological or internal injuries existed.

16

In his summary on this complaint, he states, "[f]rom my review of the chart, I see no reason for him to have been sedated with the Valium and Demerol. This may have also delayed proper diagnosis and treatment." Although once again Dr. Mitchell arguably states the standard of care, he can only say that Valium could <u>potentially</u> cover up symptoms which <u>may</u> have been important and that proper treatment <u>may</u> have been delayed by the Valium and Demerol. He does not state that any delay alone, even if it occurred, caused Tisdale's injuries, except as it is related to the assumed failure to maintain stabilization.

The third complaint is a failure to either perform or document the performance of a neurological examination. If a neurological exam was performed but not documented, Dr. Mitchell does not explain how that lack of documentation resulted in the injuries to the patient. With respect to the actual failure to perform a neurological examination, Dr. Mitchell states as follows:

> Any patient with neurological deficits should be considered to have an unstable spinal injury. Neurological evaluation should have been carried out initially and then repeated at intervals throughout his time in ER and X-ray. By documentation, this was not done and is outside the current standard of care. Had a neurological deficit been noted, immobilization should have been continued and early consultation by neurology or neurosurgery should have been carried out. It is outside current standard of care for neurological injury to be picked up at discharge from the ER.

Although Dr. Mitchell furnishes the standard of care and opines that a breach occurred, he does not state how this failure resulted in the injuries. He does not claim that the patient would have exhibited neurological deficits if the exam had been performed, nor

17

does he state that any delay resulting from the failure to perform this examination caused Tisdale's injuries, except as it relates to the assumed failure to maintain immobilization devices.

As to the delay in evaluation of the patient after he complained of not being able to move his legs, Dr. Mitchell only says that it "distresses" him that Hagedorn was notified of the patient's condition but did not examine him until 25 minutes later. He states, "I certainly think this appears to be inappropriate." Neither a standard of care nor causation is provided in this statement.

As our analysis shows, the report fails to provide a fair summary for each of the three required elements, *i.e.*, the standard of care, breach, and causation for each asserted complaint. Based on this record, we cannot say that the trial court abused its discretion in finding that the expert report did not constitute a good faith attempt to provide a fair summary of the required elements. We sustain Hagedorn's second issue and overrule Tisdale's third issue.

Having found no abuse of discretion in the court's findings as to the lack of timeliness of the filing of the expert report and the sufficiency of that report, we must address both Hagedorn's contention that the trial court should have dismissed the cause with prejudice, as well as Tisdale's claimed error in the award of attorney's fees. The statute provides that on the failure of the claimant to timely furnish the expert report, the trial court <u>shall</u> on the motion of the physician enter an order awarding sanctions against

18

the claimant or the claimant's attorney, those sanctions being the reasonable attorney's fees and costs of court, the forfeiture of any cost bond, and the dismissal of the action of the claimant against the defendant with prejudice to the refiling of the claim. Article 4590i § 13.01(e). As noted, the language of the statute contains the word "shall" as opposed to "may." It has been held that the trial court is required to dismiss with prejudice on the motion of the defendant when the statutory 180-day period has passed without a proper report being filed. *Palacios*, 46 S.W.3d at 880.

The trial court's stated reason for not dismissing the case with prejudice was that the complainant had already non-suited his cause. However, we have determined that the trial court still maintained jurisdiction to consider Hagedorn's motion to dismiss in spite of the non-suit, and therefore the court had the authority to award the sanctions provided by statute. *See Clearwater Constructors,* 788 S.W.2d at 908. The legislature provided for a dismissal with prejudice, and the complainant should not be able to escape the legislated sanction by filing a non-suit without prejudice one week prior to the court's scheduled hearing on the health care provider's motion to dismiss and prior to entry of the court's order. We therefore believe that the trial court should have granted the dismissal with prejudice. Accordingly, we sustain Hagedorn's issue on this matter.

Having also found that the award of attorney's fees was warranted, we will address Tisdale's contention that there is no competent evidence to support the amount of attorney's fees, *i.e.*, the evidence is legally and factually insufficient. The statute provides

19

for the award of reasonable attorney's fees. The amount of an award of an attorney's fee is within the discretion of the trial court. *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 556 (Tex.App.--Austin 1999, pet. denied). To determine legal sufficiency, we must examine the record for any probative evidence, which when viewed in the light most favorable to the judgment, supports it. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). In our review of the factual sufficiency, we examine the record to determine if there is some probative evidence to support the finding and if in light of all the evidence the finding is not manifestly unjust. *Id.*

Jim Hund testified that he represented Hagedorn in the case, had been in practice since 1983, and was board certified in civil trial law. As of the time of the hearing, $11,690 in attorney's fees had been incurred in the case. Hund stated that his hourly rate was $150 per hour, another attorney who had worked on the case had a rate of $125 per hour, and the two paralegals who worked on the case were billed at $65 and $60 per hour. He further stated that all of the fees incurred were reasonable and necessary in the representation of his client. Upon questioning by the court, Hund affirmed that he had taken the hourly rate of each person working on the case, multiplied them by the hours worked by each individual, and added them together to arrive at the sum of $11,690.

Tisdale contends there is no evidence as to the amount of time that counsel spent in defending the claims or that he was precluded from other employment by that representation, no evidence as to the fees customarily charged in the locality for similar

20

legal services, or time limitations imposed upon counsel by the client. The reasonableness and necessity of attorney's fees is shown by evidence that the fees were incurred while in litigation with the party sought to be charged with the fees on a claim which allows the recovery of such fees. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991).

Factors to be considered by the court in determining the amount include (1) the time and labor required, novelty and difficulty of the question presented, and the skill required, (2) the likelihood that acceptance of employment precluded other employment, (3) the fee customarily charged for similar services, (4) the amount involved and the results obtained, (5) the time limitations imposed by the client or the circumstances, (6) the nature and length of the professional relationship with the client, (7) the experience, reputation, and ability of the lawyer performing the services, and (8) whether the fee is fixed or contingent. *Arthur Andersen & Co. v. Perry Equipment Corp.,* 945 S.W.2d 812, 818 (Tex. 1997). While these are factors that may be considered, the court is not required to receive evidence on each of those factors. The court can also look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties. *Chilton Insurance Co. v. Pate & Pate Enterprises, Inc.,* 930 S.W.2d 877, 896 (Tex.App.--San Antonio 1996, writ denied).

The court is required to determine the nature and extent of the services performed, which is typically expressed by the number of hours and the hourly rate. *Pitts v. Dallas County Bail Bond Bd.*, 23 S.W.3d 407, 413-14 (Tex.App.--Amarillo 2000, pet. denied), *cert. denied,* ___ U.S. ___, 121 S.Ct. 1094, 148 L.Ed.2d. 967 (2001). However, there is no rigid requirement that both facts must be in evidence for such a determination to be made. In this instance, the court had testimony as to the total amount of fees claimed, as well as the hourly rate for each person working on the case. The court also had testimony that the amount claimed had been arrived at by multiplying the hourly rate by the hours worked. Therefore, while the court did not have the total number of hours spent on the case by each person who had devoted time to it, it still had some means to determine the approximate number of hours spent. We find the evidence both legally and factually sufficient to support the amount of attorney's fees awarded.

In summary, we overrule Tisdale's issues and sustain those of Hagedorn. Thus, the judgment of the trial court is modified to reflect that the cause of action is dismissed with prejudice, and as modified, the judgment is affirmed.

John T. Boyd
Chief Justice

Publish.

22