COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

§

MARIO PADILLA, M.D.,                                              No. 08-10-00052-CV

§

          Appellant,                                                  Appeal from

§

v.                                                                  34th District Court

§

ANITA LOWEREE,                                                  of El Paso County, Texas

§

          Appellee.                                                   (TC # 2005-1403)

§

## **O P I N I O N**

Dr. Mario Padilla brings this interlocutory appeal from the trial court's denial of a motion

to dismiss the health care liability claims against him on the basis of an inadequate expert report.

At issue is a brachial plexus injury occurring during gynecological surgery. For the reasons that

follow, we affirm.

## **FACTUAL SUMMARY**

Anita Loweree filed a medical malpractice suit against Paso Del Norte Surgery Center and

Drs. Mario Padilla and Efrain Rivera. She alleged the defendants were negligent in positioning her

body during a surgical procedure which resulted in permanent neurologic damage in her right upper

extremity. Dr. Padilla performed the surgery while Dr. Rivera provided anaesthesia services.

Loweree timely filed an expert report and curriculum vitae of Dr. Allen, an orthopedist. The

report, dated May 17, 2005, stated simply:

> I am a physician licensed and currently practicing in New Mexico. Based on my
> training, education and experience I have knowledge of the standard of care for
> positioning patients for surgery, whether gynecological, orthopedic or other specialty
> and for their monitoring during the post-anesthesia and recovery periods and am
> qualified to give opinions on the standard of care, breach of the standard of care and

causation in this case, which involves either positioning for surgery or post-anesthesia and recovery care.

.    .    .

Based on review of records it is my opinion that Anita Loweree's treatment fell below the standard of care by allowing pressure or traction on her brachial plexus to occur and continue until she suffered the plexopathy documented as quoted above, either as a result of inadequate care by those who positioned her while she was anesthetized, for which those who positioned her and, ultimately, the surgeon are responsible, or as a result of inadequate monitoring during recovery, which is the responsibility of nursing staff monitoring her; and that as a result she suffered a brachial plexus injury.

These opinions are expressed 'to a reasonable medical probability.'

Dr. Padilla filed a motion challenging the adequacy of the expert report and asked the court to dismiss the case. He argued the report was not an objective good faith effort to comply with the statute because it: (1) fails to identify Dr. Padilla; (2) is premised upon the "captain of the ship" doctrine, which Texas has rejected as a theory of liability; (3) fails to explain how or why Dr. Allen is qualified to render an expert opinion on the standard of care; (4) fails to enunciate the standard of care; (5) does not adequately explain the causal nexus between the alleged breach and Loweree's injury; (6) does not explain the injury; (7) equivocated on when and how the injury arose; and (8) was conclusory since it failed to explain how Dr. Padilla caused the injury. *See Padilla v. Loweree*, 242 S.W.3d 544, 546 (Tex.App.--El Paso 2007, no pet.). After a hearing, the court found that the report was deficient, but granted Plaintiff's request for a thirty day extension to cure the report's errors and denied Dr. Padilla's motion to dismiss.[1]

---

[1] Dr. Padilla filed an interlocutory appeal as well as a writ of mandamus arguing the trial court erred in (1) denying his motion to dismiss based on the initial report; and (2) in granting Loweree an extension to cure defects in the report. *See Padilla*, 242 S.W.3d at 545. We held that we lacked jurisdiction to consider Dr. Padilla's interlocutory appeal of an order granting an extension to cure deficiencies. *Id*. at 544. We also denied mandamus relief because there was no clear abuse of discretion in the trial court's decision to grant the extension and Dr. Padilla had another adequate remedy. *See In Re Mario Padilla, M.D.*, 242 S.W.3d 549, 552 (Tex.App.--El Paso, 2007, no pet.)

Loweree timely filed a curative report and curriculum vitae by Dr. Allen dated July 11, 2006. Dr. Padilla again objected by filing a motion to dismiss Loweree's claims asserting the July 11, 2006 curative report failed to comport with Section 74.351(r)(6) of the Texas Medical Liability Act. In the motion, Dr. Padilla argued that many of the initial problems were repeated in the curative report and he incorporated all of his previous arguments and authorities.

Following a hearing on Dr. Padilla's motion, the trial court entered judgment determining that the curative report constituted an objective, good-faith effort to comply with the Texas Medical Liability Act, and denied Dr. Padilla's motion to dismiss. This appeal follows. Dr. Padilla complains that the trial court should have dismissed the suit based on his challenges to the adequacy of Dr. Allen's July 2006 curative report because: (1) Dr. Allen lacks the requisite expertise to render opinions on the standard of care, breach, and causation; (2) Dr. Allen's report failed to set out the standard of care and any specific breach by Padilla; and (3) Dr. Allen's report did not provide an explanation of the casual nexus between Padilla's alleged breach and Loweree's injury.

## STANDARD OF REVIEW

A trial court's ruling on a motion to dismiss a health care liability claim is reviewed for clear abuse of discretion. *See Bowie Memorial Hospital v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *American Transitional Care Ctrs. Of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). *See also Kendrick v. Garcia*, 171 S.W.3d 698, 702-03 (Tex.App.--Eastland 2005, pet. denied)(utilizing the abuse of discretion standard of Palacios to review denial of a motion to dismiss under Section 74.351). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Kendrick*, 171 S.W.3d at 703, *citing Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). There is no abuse, however, simply because a trial court may

decide a matter within its discretion differently than an appellate court. *Downer*, 701 S.W.2d at 242. When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for that of the trial court, thus insulating the trial court's decision from appellate second guessing. *Wright*, 79 S.W.3d at 52.

## APPLICABLE LAW

A claimant shall, not later than the 120th day after the date the claim was filed, serve on each party or party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report, for each physician or health care provider against whom a liability claim is asserted.[2] *See* TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(a)(West 2011).

If the plaintiff timely furnishes an expert report, a defendant may challenge the report's adequacy. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(a). A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6). TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(*l*). An expert report is defined as:

> [A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(6).

To constitute a good-faith effort, an expert report must provide sufficient information to fulfill two purposes: (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Wright*,

---

[2] Loweree's lawsuit was filed before the effective date of the 2005 amendment to Section 74.351(a). *See* TEX.CIV.PRAC.&REM.CODE ANN. § 74.351 (a).

79 S.W.3d at 52, *citing Palacios*, 46 S.W.3d at 879. A report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on the standard of care, breach, and causal relationship. *Wright*, 79 S.W.3d at 52.

A defendant may pursue an interlocutory appeal from an order that denies all or part of the relief sought by a motion under Section 74.351(b). *See* TEX.CIV.PRAC.&REM.CODE ANN. § 51.014(a)(9)(West 2008).

## DR. ALLEN'S QUALIFICATIONS

In Issue One, Dr. Padilla argues the report and curriculum vitae are inadequate because they fail to demonstrate that Dr. Allen is qualified to testify. There are two kinds of experts in health care liability claims against physicians: those offering opinions on the standard of care, and those offering opinions on causation. TEX.CIV.PRAC.&REM.CODE ANN. §§ 74.401, 74.403. Dr. Allen's qualifications to provide an expert report must be made on the basis of the contents of his report and curriculum vitae. *In re Windisch*, 138 S.W.3d 507, 511 (Tex.App.--Amarillo 2004, no pet.); *Chisholm v. Maron*, 63 S.W.3d 903, 907 (Tex.App.--Amarillo 2001, no pet.); *see Palacios*, 46 S.W.3d at 878. A court reviewing the adequacy the report should look no further than the report itself because all information relevant to the inquiry is contained within its four corners. *In re Windisch*, 138 S.W.3d at 511; *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878. Accordingly, we must make our determination from a review of the report, including the curriculum vitae.

With respect to his qualifications, Dr. Allen's report states:

I am a physician licensed and currently practicing medicine in the State of New Mexico and U.K. Certified in Orthopedic Surgery. My current practice is office based Orthopedics. Based on my training, education and experience I have knowledge of the standard of care for positioning patients for surgery, whether orthopedic, gynecological or other specialty and for their monitoring during surgery and post-anesthesia and recovery periods. My training, education and experience include but are not limited to making decisions on positioning and monitoring,

prescribing appropriate positioning and monitoring, and oversight of medical, nursing and other staff in performance of those activities during pre-, intra- and postoperative periods. I am qualified to give opinions on the standard of care, breach of the standard of care and causation in this case, which involves positioning for surgery or post-anesthesia and recovery care and involves an injury to the brachial plexus. Brachial plexus injuries are typically treated by orthopedic surgeons or neurosurgeons and are among injuries I have treated in my orthopedic practice and during my training in neurosurgery.

While there are additional standards of care specific to individual specialties, there are fundamental standards that apply to all. These include but are not limited to positioning and handling the patient in a manner that protects against skin damage and protects against nerve damage of parts of the body that are not in the operation field. They include protection against brachial plexus injury for all patients, regardless of the procedure involved. These standards apply not only to medical staff, but also to nursing staff, surgical and operating room technicians and other ancillary paramedical staff participating or involved in these areas and acts of patient care. Therefore, with respect to Mario Padilla, M.D., the gynecology surgeon in this case, Efrain Rivera, M.D., the anesthesiologist in this case and employees of Paseo Del Norte Surgery Center my knowledge and experience of oversight of patient care in operative and perioperative settings qualify me to offer expert opinions regarding those standards of care.

A person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX.CIV.PRAC. & REM.CODE ANN. § 74.401(a). In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2)  is actively practicing medicine in rendering medical care services relevant to the claim.

Tᴇx.Cɪᴠ.Pʀᴀᴄ.&Rᴇᴍ.Cᴏᴅᴇ Aɴɴ. § 74.401(c).  Every licensed doctor is not automatically qualified to testify as an expert on every medical question.  *Hagedorn v. Tisdale,* 73 S.W.3d 341, 350 (Tex.App.--Amarillo 2002, no pet.); *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996).  On the other hand, the fact that an expert is not a specialist in the particular branch of the profession for which the testimony is offered will not automatically disqualify him as an expert.  *Hagedorn*, 73 S.W.3d at 350; *Blan v. Ali*, 7 S.W.3d 741, 745 (Tex.App.--Houston [14th Dist.] 1999, no pet.).  The issue is the specific subject matter and the expert's familiarity with it.  *Hagedorn*, 73 S.W.3d at 350; *see Broders*, 924 S.W.2d at 153; *Blan*, 7 S.W.3d at 745.  Here, because Dr. Allen is not in the same school of practice as Dr. Padilla, *i.e.* gynecological surgery, he must establish that he has practical knowledge of what is usually and customarily done by other practitioners under the same or similar circumstances.  *Olveda v. Sepulveda*, 141 S.W.3d 679, 682 (Tex.App.--San Antonio 2004), *pet. denied*, 189 S.W.3d 740 (Tex. 2006).

A person may qualify as an expert witness on the issue of the causal relationship between the alleged breach and the injury claimed, "only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence."  Tᴇx.Cɪᴠ.Pʀᴀᴄ.&Rᴇᴍ.Cᴏᴅᴇ Aɴɴ. § 74.403(a).  Texas Rule of Evidence 702 requires an expert witness to be qualified on the basis of "knowledge, skill, experience, training, or education."  Tᴇx.R.Eᴠɪᴅ. 702.

In deciding whether an expert is qualified, the trial court must ensure those who purport to be experts truly have expertise concerning the "actual subject about which they are offering an opinion." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006), *citing Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998).  The trial court is not required

to admit opinion evidence which is connected to the existing data by the *ipse dixit* of the expert. *Mendez*, 204 S.W.3d at 801. If the expert brings merely his credentials and subjective opinion, his testimony is unsupported and cannot be of assistance to the jury. *Id* . Rule 702 requires that expert testimony actually assist the trier of fact to be admissible. *Id.*

The issue here is a brachial plexus injury resulting from either surgical or post-surgical positioning. Dr. Padilla maintains that Dr. Allen is not board certified in the United States, and that he has no training or experience with gynecological surgery. Padilla also contends that Dr. Allen did not have any surgical experience during the relevant time frame. According to the curriculum vitae, at the time the injury occurred, Dr. Allen was finishing law school at Texas Tech University in Lubbock. It is unclear whether his part-time practice in Hobbs, New Mexico remained open during the time he was enrolled in law school, or what type of medicine he practiced during that time. From November 2003 through the present (including the time of the report), Dr. Allen had an office-based orthopedic practice in Albuquerque, New Mexico. His report states that a brachial plexus injury is an injury generally treated by orthopedic surgeons or neurosurgeons. Additionally, brachial plexus injuries "are among injuries I have treated in my orthopedic practice and during my training in neurosurgery."

Dr. Allen makes no reference as to how many brachial plexus injuries he has treated or whether he treated any such injuries during the relevant time periods. There is also nothing in the report or curriculum vitae which states that Dr. Allen was actively rendering care as a surgeon during either the time the claim arose, or the time the report was written. The last reference to any hospital staff position in the curriculum vitae is in 1989, when Dr. Allen resigned from the Española Hospital Medical Staff.

While the proper positioning and padding of a patient's arm during the gynecological surgical

procedure is not a subject exclusively within the knowledge or experience of a physician specializing in such surgery, Dr. Allen must show he is a physician who is experienced in and familiar with how such surgical procedures--including the positioning and padding of patients' extremities--are managed. *See Barber v. Dean*, 303 S.W.3d 819, 826 (Tex.App.--Fort Worth 2009, no pet.). According to Dr. Allen's report, the relevant standard of care is basic and not limited to any particular specialty. Although Dr. Allen has not practiced in a hospital since 1989, Section 74.401 requires the trial court to consider whether the expert was actively participating in rendering medical care "relevant to the claim." TEX.CIV.PRAC.&REM.CODE ANN. § 74.401(c). The "actively participating" prong is a consideration in determining whether the expert has sufficient training or experience to testify. *See id*. While Dr. Allen was not active in a hospital practice, he was actively practicing orthopedic medicine and opined that the injury involved was of the type he treated in his practice. Therefore, we cannot conclude that the trial court abused its decision in finding that Dr. Allen was qualified to opine on the standard of care.

We turn now to causation. The report indicates that Dr. Allen is a physician who had knowledge and experience concerning the subject of his opinion. Based on the four corners of the report and curriculum vitae, Dr. Allen is qualified to render an opinion as to the standard of care required for positioning patients during surgery and the cause Mrs. Loweree's brachial plexus injury. We overrule Issue One.

## ADEQUACY OF THE REPORT

In Issues Two and Three, Dr. Padilla argues that the trial court erred in denying his motion to dismiss because Dr. Allen's report is inadequate under applicable law. An adequate report is one which provides a "fair summary" of the standard of care, breach of that standard, and an explanation as to how that breach caused the alleged injury. TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(6).

Dr. Allen's report states that his training, education, and experience include "making decisions on positioning and monitoring, prescribing appropriate positioning and monitoring, and oversight of medical, nursing and other staff in performance of those activities during pre-, intra-, and postoperative periods."  Also based on his training, experience, and education, he has "knowledge of the standard of care for positioning patients for surgery, whether gynecological, orthopedic or other specialty and for their monitoring during the post-anesthesia and recovery periods," and "[is] qualified to give opinions on the standard of care, breach of the standard of care and causation in this case, which involves either positioning for surgery or post-anesthesia and recovery care."  Dr. Allen then references extracts from the medical records provided from Loweree's December 20, 2002 surgical procedure at Paso Del Norte Surgery Center, including numerous references to the surgical procedure report, specifically noting when anesthesia started and finished, the post anesthesia recovery score, and the nursing records, specifically noting the patient's complaints of numbness in her right arm.  Dr. Allen's report also recounts from the April 16, 2003 record of Loweree's care the following: "'. . . hysterectomy in December 2002 and . . . was unable to move her right arm after she woke from anesthesia . . . Impression:  Global plexopathy. . . . '"

Dr. Allen provided the following analysis:

> Nursing notes first document right upper extremity dysfunction at 1620 on the day of surgery.  Although nursing staff 'called and updated' Dr. Padilla at 1720, which indicates they spoke with him, the 1740 entry -- 'call placed to Dr. Padilla to notify numbness right arm' -- indicates only placing a call, not that contact was made and suggests he was not told at 1720.  Urgency is not apparent in these notes.
>
> Despite documenting weakness and numbness at 1620, subsequent nursing notes at 1910, 2000, 0010, 0245, and 0615 all indicate Neurologic and Neurovascular as normal.  Since all subsequent notes document continuing weakness and numbness it is reasonable to conclude that nursing notes at those times were erroneous.
>
> Postoperative nursing notes from PACU quoted above, timed at 1050, 1105, 1120, 1135, and on discharge from PACU all indicate 'moves 4 extremities or as pre-op.'

One would accept these as accurate observations, indicating normal function, but for the fact, noted in the paragraph above, that five nursing assessments made after the problem was first documented were presumably all erroneous.

If the PACU observations are correct, then the brachial plexus injury subsequently documented occurred between the final PACU observation at or about 1230 and 1620, when it was first noted.

Alternatively, [if] the PACU observations are incorrect, Mrs. Anita Loweree suffered the brachial plexus injury during surgery while under general anesthesia for three hours and fifty minutes, but it was not identified until 1620, almost five and a half hours after the end of anesthesia, after which nursing notes again do not document it at times quoted above.

The record is silent on the number and position of armboards, the angle at which armboards were set, whether they were moved or adjusted and on the position of Mrs. Loweree's arms, therefore information is lacking on whether there were errors in initial arm positioning, but records note 'Position . . . OK'd by Dr. Padilla,' which is taken to mean that Dr. Padilla approved Mrs. Loweree's positioning.

Post op assessment documents 'good . . . per Dr. Rivera' and 'Patient free of s/s of injury related to . . . positioning.' The source of the second observation is not given, other than at the bottom of the page (page 2 of 2) where there is a nurse signature, which might be 'C Finnegan' below 'Report given to: A Rogers RN.' This is taken to mean Dr. Rivera examined the patient after surgery, but there are no data of Dr. Rivera's findings at that examination in that record.

Because these notes give conflicting data the exact time at which Mrs. Loweree suffered the right brachial plexus injury is not defined, however, she did not have the brachial plexus injury when she entered the operating room and she did have the brachial plexus injury not later than 1620. The most likely period in which she suffered this injury is during surgery, when she was unconscious and immobile for approximately four hours.

This is also the conclusion of her treating hand surgeon, Jose Monsivais, M.D., who noted her history and examination were '. . . compatible with a brachial plexus injury with incomplete recovery at this time. Nerve conduction velocities and electromyography confirms the diagnosis. Based on her history and physical examination along with electrodiagnostic studies and MRI imaging, the etiology of her brachial plexus is most likely secondary to a traction injury probably from positioning during her hysterectomy surgery. . . .'

The standard of care for surgeons, anesthesiologists, anesthetists, and nurses and all others who position anesthetized patients includes but is not limited to positioning, padding and supporting them in such a way that their limbs are not subjected to

pressure or traction injuries to nervous tissue such as Mrs. Loweree suffered. This is a basic standard to which all who perform this service are held; no specialty or profession is excused.

While all who participate in positioning a patient are responsible for their acts, ultimate responsibility for positioning lies with the surgeon. In Mrs. Loweree's case these people are Mario Padilla, M.D., gynecology surgeon, Efrain [Rivera], M.D., anesthesiologost and nurses and other staff employed by Paseo Del Norte Surgical Center and involved in intra- and perioperative care of Mrs. Loweree.

While the surgeon is operating and taking no part in positioning or repositioning, responsibility for the patient's position and changes in position belongs to the anesthesiologist and those who assist at the anesthesiologist's direction or with the anesthesiologist's permission. The procedure file confirms this at II: '. . . secure permission from the anesthesiologist before doing anything to anesthetized patient.' After the procedure the surgeon and anesthesiologist are responsible for determining and approving the patient's position and for ordering appropriate monitoring and care. Nursing and ancillary staff responsibility is transferred from department to department as the patient is transferred between them.

The standard of care for patients during recovery from general anesthesia includes but is not limited to attention to positioning for the same reasons, but also includes accurate monitoring, including but not limited to data required by the monitoring and procedure charts quote above, and reporting abnormal observations such as a fresh complaint of numbness and weakness in a limb to the patient's physician as soon as possible. Responsibility lies with the nursing staff in whose care the patient is placed at that time.

Because the record is silent on the time of the act or failure to act that created the brachial plexus injury apportionment of responsibility among Drs. Padilla and Rivera, and Paseo Del Norte Surgical Center staff is not offered, but these are those with whom responsibility lies.

Based on the review of records it is my opinion that Anita Loweree's treatment fell below the standard of care by allowing pressure or traction on her brachial plexus to occur and continue until she suffered the plexopathy documented as quoted above, either as a result of inadequate care by those who positioned her before and while she was anesthetized, for which those who positioned her and, ultimately, the surgeon are responsible, or as a result of inadequate monitoring during her recovery, which is the responsibility of nursing staff monitoring her; and that as a result she suffered a brachial plexus injury. In the case of Mrs. Loweree the term 'the surgeon' refers to Mario Padilla, M.D., the 'anesthesiologist' to Efrain Rivera, M.D. and the nursing and other staff referred to are those of Paseo Del Norte Surgery Center.

These opinions are expressed 'to a reasonable medical probability.'

## Standard of Care and Breach Thereof

In Issue Two, Dr. Padilla argues that the report's discussion as to the standard of care and alleged breach are inadequate. He complains that Dr. Allen's report does not implicate his conduct, does not state that a standard of care was applicable to any actions or inactions by him, does not allege that he breached a standard of care, and does not allege that his actions or inactions caused any harm, injury, or damage to Loweree.

A defendant's breach of the standard of care must be identified by "specific information about what the defendant should have done differently." Dr. Allen's report states that the standard of care for surgeons, "includes but is not limited to positioning, padding and supporting [patients] in such a way that their limbs are not subjected to pressure or traction injuries to nervous tissue such as Mrs. Loweree suffered." Later in the report, Dr. Allen concludes:

> Based on review of records it is my opinion that Anita Loweree's treatment fell below the standard of care by allowing pressure or traction on her brachial plexus to occur and continue until she suffered the plexopathy documented as quoted above, either as a result of inadequate care by those who positioned her while she was anesthetized, for which those who positioned her and, ultimately, the surgeon are responsible, or as a result of inadequate monitoring during her recovery, which is the responsibility of nursing staff monitoring her; and that as a result she suffered a brachial plexus injury.

Padilla argues Dr. Allen's report fails to identify the appropriate actions which should be taken in the positioning of a patient and what specific acts Dr. Padilla failed to do, or should have done differently. Although Dr. Allen refers to the lack of information in the reports he studied as the reason he fails to identify how Mrs. Loweree was positioned and padded, he did not explain how Mrs. Loweree should have been padded.[3] "It is not sufficient for an expert to simply state that he

---

[3] In his report Dr. Allen states: "The record is silent on the number and position of armboards, the angle at which armboards were set, whether they were moved or adjusted and on the position of Mrs. Loweree's arms, therefore information is lacking on whether there were errors in initial arm positioning, but records note 'Position . . . OK'd by Dr. Padilla', which is taken to mean that Dr. Padilla approved Mrs. Loweree's positioning."

or she knows the standard of care and concludes it was [or was not] met." *See Chopra v. Hawryluk*, 892 S.W.2d 229, 233 (Tex.App.--El Paso 1995, writ denied). "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." *Palacios*, 46 S.W.3d at 880. The report must provide enough information to inform Dr. Padilla of the conduct called into question.

In reviewing a trial court's decision for an abuse of discretion, we cannot substitute our own judgment for that of the trial court's. Dr. Allen clearly found fault with the medical records and the inconsistencies related to the time of injury, both of which he explained in detail. Based on these facts, we cannot say the trial court abused its discretion in finding that the expert report provided Dr. Padilla with enough information to inform him that the conduct called into question, i.e. his positioning of Mrs. Loweree during surgery, caused her injury. Issue Two is overruled.

## Causation

Finally, in Issue Three, Dr. Padilla contends the trial court abused its discretion because the statements in Dr. Allen's report as to causation are conclusory and fail to link any alleged breach by Padilla to the injuries claimed by Loweree in her suit. According to Padilla, the report equivocates about when the injury arose and who was responsible.

A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that absent said act or omission the harm would not have occurred. *Costello v. Christus Santa Rosa Heath Care Corp.*, 141 S.W.3d 245, 249 (Tex.App.--San Antonio 2004, no pet.). An expert report must provide information linking the defendant's purported breach of the standard of care to the plaintiff's injury. *Wright*, 79 S.W.3d at 53; *see also Hutchinson v. Montemayor*, 144 S.W.3d 614, 617 (Tex.App.--San Antonio 2004, no pet.). The expert must also explain the basis of his statements to link his conclusions to the facts.

*Wright*, 79 S.W.3d at 52. The report must provide enough information to inform the defendant of the conduct at issue and allow the trial court to conclude that the suit has merit. *Hutchinson*, 144 S.W.3d at 617.

The report includes Dr. Allen's opinions on the elements of the manner in which the care rendered failed to meet the applicable standards of care and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 74.351(r)(6). He criticizes the nursing notes documenting right upper extremity dysfunction at 1620 followed by five notes indicating normal neurologic responses. "One would accept these as accurate observations, indicating normal function, but for the fact, noted in the paragraph above, that five nursing assessments made after the problem was first documented were presumably all erroneous." Dr. Allen also reiterated the conclusions of Loweree's hand surgeon that "the etiology of her brachial plexus is most likely secondary to a traction injury probably from positioning during her hysterectomy surgery." Dr. Allen detailed the importance of positioning and repositioning a patient. But inadequate reporting hampered his ability to apportion responsibility between Dr. Padilla, Dr. Rivera, and the surgical staff. The report is far from perfect, but we cannot conclude that the trial court abused its discretion in finding it adequate. We overrule Issue Three and affirm the judgment.

August 31, 2011

_____

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.