Opinion issued April 18, 2013



In The

# Court of Appeals

For The

# First District of Texas

————————————————

## NO. 01-12-00407-CV

————————————————

**CYRIL B. TAWA, M.D., HOUSTON INTERVENTIONAL CARDIOLOGY, P.A., AND ANGELA ROWAN, R.N. F.N.P. -C, Appellants**

**V.**

**GLENN P. GENTRY AND PATRICIA GENTRY, Appellees**

---

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Case No. 2011-05219**

---

## MEMORANDUM OPINION

This is an interlocutory appeal from the denial of appellants' motions to dismiss under Chapter 74 of the Texas Civil Practice and Remedies Code. We reverse the trial court's order denying appellants Angela Rowan's and Houston

Interventional Cardiology's motion to dismiss (as it relates to care provided by Rowan) and remand to the trial court for assessment of attorneys' fees and costs. We affirm the trial court's order denying appellants Cyril Tawa's and Houston Interventional Cardiology's motion to dismiss (as it relates to care provided by Tawa).

## BACKGROUND

The following summary of the plaintiff's hospital visit, during which he suffered a stroke, is taken from Dr. Nicolaos Madias's August 8, 2011 expert report[1]:

On November 14, 2008, 53 year-old plaintiff/appellee Glenn Gentry (Gentry) visited his primary physician, Dr. Keller, complaining of fatigue and shortness of breath. Keller determined that he had atrial fibrillation with a rapid ventricular rate. Keller sent Gentry to the Emergency Room at North Cypress Medical Center. Upon admittance, he was seen by defendant/appellant Dr. Cyril B. Tawa, M.D., the attending physician, and defendant/appellant Angela Rowan, Tawa's nurse practitioner. Gentry's primary complaint was heart palpitations and he was "found to have atrial fibrillation with a ventricular rate of 130 beats per

---

[1] For purposes of our review of the adequacy of a medical expert report under Chapter 74, we take the allegations in the report as true. *Marino v. Wilkins*, ___ S.W.3d ___, ___ n.1, 2012 WL 749997, at *17 n.1 (Tex. App.—Houston [1st Dist.] Mar, 8, 2012, pet. denied).

2

minute." In the Emergency Room, Gentry was given "Cardizem bolus followed by a Cardizem drip to control the ventricular rate."

Upon admission, Gentry was taken off some of his regular medication and others were prescribed. Specifically, he was "prescribed to discontinue Lovenox and Lisinopril; to take Toprol XL, Clonidine, started [on] a Heparin drip and Coumadin (warfarin)." The following three days, November 15, 16, and 17, Tawa ordered Coumadin be administered.

Several medical tests were performed on Gentry's heart and kidneys during his hospital stay. According to the records, Mr. Gentry had "elevated creatinine." Tawa then consulted with Dr. Lal, who determined that a kidney biopsy was necessary. "Medications that promote reversal of Coumadin effects as well as infusion of coagulation facts were prescribed on November 18, 2008, including vitamin K iv and FFP (fresh frozen plasma)." "Lal wrote in a Progress Note on November 18 that a plan was made for a kidney biopsy (Dr. Tawa, Dr. Keller, Dr. Morello, patient); FFP, vit K iv; hold Coumadin and heparin."

The kidney biopsy was performed on November 19, 2008, and later that day Gentry's records indicate he had a "CVA (*cerebrovascular accident*) believed to be of ischemic origin with left hemiparesis, aphasia, lethargy." "Impression and plan included: atrial fibrillation, embolism, not a candidate for TPA because of recent kidney biopsy, MRI, and transfer to ICU," where he "received a 'heparin

3

drip." His stroke "resulted in aphasia and weakness of left extremities." A neurology consultation that same night indicated that "Gentry had developed hemiplegia, probably cardio embolic and this was discussed with Dr. Lal, Dr. Tawa, and his family, and heparin infusion was prescribed."

The medical records also describe the results of CT scans of his heart and brain, and later ultrasound images of his carotid and vertebral arteries." At the time of his discharge from the hospital on December 1, 2008, "Gentry had left-sided weakness, speech impairment, sitting up in a chair and in normal sinus rhythm."

Gentry and his wife, Patricia Gentry, sued Dr. Tawa, Dr. Lal, Rowan, and Houston Intervention Cardiology, P.A. On June 14, 2011, pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code, the Gentrys served the defendants with an expert report and *curriculum vitae* (CV) of Dr. Nicolaos E. Madias, M.D. Defendants Tawa, Rowan, and Houston Intervention Cardiology filed objections and motions to dismiss. The trial court overruled the objections, but granted the Gentrys 30 days to cure any deficiencies in Madias's report. The Gentrys timely filed an Amended Expert Report and CV. Tawa, Rowan, and Houston Intervention Cardiology filed objections again, as well as a motion to dismiss and request for attorneys' fees. The trial court denied defendants' motion, and Tawa, Rowan, and

4

Houston Intervention Cardiology timely brought this interlocutory, accelerated appeal.

## ISSUES ON APPEAL

Appellants argue that Madias's amended report does not represent a good faith effort to comply with section 74.351(r)(6) of the Texas Civil Practice and Remedies Code. Accordingly, appellants argue that the trial court abused its discretion by overruling their objections to Madias's amended report, and by denying their motions to dismiss and refusing to award attorneys' fees. Appellants seek reversal of the trial court's orders, dismissal with prejudice of the Gentrys' claims against appellants, and a remand to the trial court with instructions to award to appellants reasonable attorneys' fees and costs.

## APPLICABLE LAW

Section 74.351 of the Texas Civil Practice and Remedies Code requires the trial court perform a 'gate-keeper' function, to prevent medical negligence causes of actions from proceeding unless the claimant has made a good-faith effort to demonstrate that at least one expert believes that a breach of the applicable standard of care caused the claimed injury. *TTHR, L.P. v. Guyden*, 326 S.W.3d 316, 319 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351; *Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005)). "A report need not marshal all of the plaintiff's proof but it must include the

expert's opinions on the three statutory elements: standard of care, breach, and causation." *Id.*; *see Am. Transitional Care Centers v. Palacios*, 46 S.W.3d at 873, 880 (Tex. 2001); *Spitzer v. Berry*, 247 S.W.3d 747, 750 (Tex. App.—Tyler 2008, pet. denied) (quoting *Palacios*, 46 S.W.3d at 880) (stating "fair summary" is "something less than a full statement" of applicable standard of care, how it was breached, and how that breach caused injury).

To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879. A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id*. The expert must explain the basis for his statements and link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (citing *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). The trial court may not draw any inferences, but must rely exclusively on the information contained within the report's four corners. *See TTHR*, 326 S.W.3d at 319. In addition to setting forth the requisite criteria, a Chapter 74 report must also be authored by a qualified "expert." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

6

We review a trial court's decision on a motion to dismiss a case for failure to comply with section 74.351 for an abuse of discretion. *Palacios*, 46 S.W.3d at 877; TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(Vernon Supp. 2009). Although we defer to the trial court's factual determinations, we review questions of law de novo. *Rittmer v. Garza*, 65 S.W.3d 718, 722 (Tex. App.—Houston [14th Dist.] 2001, no pet.). To the extent that resolution of the issue before the trial court requires interpretation of the statute itself, we apply a de novo standard. *Buck v. Blum*, 130 S.W.3d 285, 290 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

## DR. TAWA

In appellants' first issue, they argue that the trial court abused its discretion in failing to find Madias's report deficient as it relates to Tawa (and to the vicarious liability of Houston Interventional Cardiology for Tawa's care). Specifically, Tawa argues that Madias's report is deficient because (1) he is "not qualified to render an opinion regarding the applicable standard of care for Dr. Tawa," (2) it "fails to specify the applicable standard of care," (3) it "fails to adequately set forth the manner in which Tawa allegedly breached the standard of care," and (4) it "fails to discuss the causal relationship between the breach and Mr. Gentry's" stroke.

7

**A. Qualification**

Tawa contends that Madias's report "seek[s] to hold Dr. Tawa strictly liable for the conduct of all, solely by virtue of the fact that Dr. Tawa signed Mr. Gentry's admitting order." This, according to Tawa, "invents a dangerous new brand of vicarious liability, casting a net over the 'attending physician' and any and all health care providers that subsequently come into contact with a patient." He notes that not every licensed doctor is automatically qualified to testify on every medical question, *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996), and that, to offer his opinion on the standard of care applicable to attending physicians, Madias's expertise must be evident from the four corners of his report and his CV. *Palacious*, 46 S.W.3d at 878.

Tawa relies on *Christus Health Southeast Texas v. Broussard*, 267 S.W.3d 531, 536–37 (Tex. App.—Beaumont 2008, no pet.), a case in which a neurologist expert opined on the standard of care applicable to a hospital's administrative decisions. Specifically, the expert—who had experience treating patients that, like the complainant, had "a history of fluctuating mental capacities"—opined about the hospital's decisions related to the complainant's discharge from long-term care. *Id.* The complainant was intubated and being treated for "pneumonia and acute respiratory deficiency." *Id.* at 534. While the complainant was waiting to be discharged pursuant to her doctor's orders, plaintiff alleged that the defendant

8

hospital removed the complainant's finger pulse oximeter, then left complainant unrestrained and unsupervised. *Id.* She dislodged her breathing tube and suffered a hypoxic brain injury. *Id.* The court noted that the expert's report and CV did not "explain how his experience with treating patients with fluctuating mental status gives him expertise regarding a hospital's 'administrative decision' about the circumstances under which a hospital can disregard a doctor's discharge order." *Id.* at 536. It thus held that the expert's report did not demonstrate that he was qualified to opine on the hospital's standard of care in making administrative decisions:

> [The expert's] report and curriculum vitae explain that he has active staff privileges at Reston Hospital, where he sits on the credentials committee, and that he is on the utilization review subcommittee for the neurology section of Fairfax Hospital. As [plaintiff] argued in his response to the motion to dismiss, "this case concerns the Defendant Hospital's decision to abandon [complainant], not whether the nursing staff followed protocol." The report does not state that [the expert] is familiar with hospital administration or the standards to be applied to implementing an attending physician's discharge order. The fact that [the expert] is on staff at a hospital and serves on that hospital's credentials committee does not establish that he possesses specialized knowledge of the protocols, policies, or procedures a hospital of ordinary prudence would have had in place in determining when a facility should disregard a discharge order. *See Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 409 (Tex. App.—Fort Worth 2003, no pet.).
> [The expert's] report and curriculum vitae do not explain how [his] committee assignments and experience on staff at Reston Hospital make him familiar with the standards applied by hospitals under these circumstances. Thus, the trial court abused its discretion in overruling [defendant's] objections to [the expert's] report.

9

267 S.W.3d at 536.

According to Tawa, "Dr. Madias' opinion regarding Dr. Tawa's liability is not based upon the medical care Mr. Gentry received from Dr. Tawa." Rather, he asserts, "Madias' conclusion regarding liability is based upon whether Dr. Tawa should have made the administrative decision to prevent implementation of another physician's order." Thus, Tawa contends that, like the report at issue in *Broussard*, Madias's report does not show he is qualified to opinion about "customs, policies and procedures."

The Gentrys respond that Tawa's argument "represents either a mischaracterization or a misunderstanding of the opinion offered by Dr. Madias." They argue that nowhere in Madias's report does he opine that Tawa as the attending physician is strictly liable for other's care; nor does he suggest that Tawa should have "overruled" the orders of another physician. Instead, Madias notes that as the attending physician, Tawa is responsible for managing the overall care of the patient, which might include attempting to prevent performing procedures that "pose a great risk to the patient given the totality of that patient's medical circumstances." The Gentrys also point out that Lal's progress notes "indicate that Dr. Tawa was a party to the decision to stop Mr. Gentry's antithrombotic treatment and administer procoagulant treatment," such that he may have "endorsed or approved these decisions." Finally, the Gentrys contend that it is apparent from

10

Madias's report and CV that he familiar with the standard of care regarding attending physicians similarly situated with Tawa.

**1. Applicable Law**

Chapter 74 sets forth general criteria for qualifying an expert physician:

> (a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM. CODE § 74.401(a).

The relevant issue is not "the physician's area of practice but the stated familiarity with the issues involved in the claim before the court." *Pediatrix Med. Group, Inc. v. Robinson*, 352 S.W.3d 879, 884 (Tex. App.—Dallas 2011, no pet.). "Where a particular subject of inquiry is common to and equally developed in all fields of practice, and the prospective medical expert witness has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those with confronted the practitioner charged with

11

malpractice, the witness is qualified to testify." *Rittger v. Danos*, 332 S.W.3d 550, 559 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

## 2. Analysis

Madias is board certified in Internal Medicine, licensed to practice in Massachusetts, and is a professor at Tuffs University School of Medicine. His report states that he has reviewed Gentry's medical records and is "qualified to evaluate and render an opinion . . . based on the following":

(1)  I have the training and experience in the management of patients with atrial fibrillation; in the use of anticoagulation therapy in these patients; in the risk of embolic stroke in the absence of anticoagulation therapy; in the indications and contraindications of a kidney biopsy; and in the diagnosis and management of kidney disease.

(2)  I have been actively practicing medicine and caring for patients like Mr. Gentry at the time he was diagnosed with atrial fibrillation and thereafter including the time that the claim was filed. In addition, I have been actively involved in the diagnosis and management of kidney disease during the same period.

(3)  I have knowledge of the standard of care associated with the diagnosis and treatment of the illness and injury that Mr. Gentry suffered, including his atrial fibrillation, the need for anticoagulation, the risks of embolic stroke, and management of kidney diseases.

(4)  As a doctor of Internal Medicine who has treated many patients with atrial fibrillation and uncontrolled hypertension, I have knowledge of the risks involved when such patients' antithrombotic treatment is discontinued. The consequences of discontinuation of antithrombotic therapy and the causes of cardiac embolism are well known within the specialty of

Internal Medicine. Because of this, I am qualified to offer opinions on the causation of Mr. Gentry's injuries.

To determine if Madias is qualified to opine on the standard of care applicable to Tawa, we look to "the medical condition involved in the claim and . . . the expert's familiarity and experience with it." *Grandbury Minor Emergency. Clinic v. Thiel*, 296 S.W.3d 261, 267 (Tex. App.—Fort Worth 2009, no pet.).

Tawa's argument that Madias is not qualified to render an opinion rests primarily on his assertion that "Dr. Madias' opinion regarding Dr. Tawa's liability is not based upon the medical care Mr. Gentry received from Dr. Tawa," but instead whether "Tawa should have made the administrative decision to prevent implementation of another physician's order." From this, Tawa argues that Madias has not shown himself qualified to testify about such "administrative" decisions.

We disagree with Tawa's narrow characterization of Madias's opinion. Madias opines that Gentry's stroke was most likely caused by "the discontinuation of Coumadin and administration of FFP and vitamin K." He opined that Tawa's standard of care encompassed both his role as attending physician to be "responsible for the entire care delivered to the patient by all healthcare providers," and his "role of internist caring for the atrial fibrillation and the management of this condition." Madias opined that a "patient with atrial fibrillation of uncertain time as to the initiation of the arrhythmia and on Coumadin therapy should not

13

discontinue all antithrombotic therapy unless clots in the atria are absent or active bleeding is present." He also states, with regard to Tawa, that "the standard of care requires an internist to know that administration of fresh frozen plasma and vitamin K to reverse the anticoagulation caused by Coumadin therapy is very risky in a patient like Mr. Gentry since discontinuation of antithrombotic therapy may help to trigger the development of more clots in the atria."

According to the medical record summary contained in Madias's report, after admitting Gentry to the hospital, Tawa prescribed, among other things, Coumadin and Heparin to address his atrial fibrillation. "Lal wrote in a Progress Note on November 18 that a plan was made for a kidney biopsy (Dr. Tawa, Dr. Keller, Dr. Morello, patient); FFP. Vit K iv.; hold Coumadin and heparin." Tawa argues that this Progress Note is not sufficient to suggest that he had any involvement in the medical decision to discontinue the medication that he had previously prescribed, and he argues that "the Amended Report does not state or even suggest that Dr. Tawa participated in the decision to discontinue Coumadin therapy and administer vitamin K and fresh frozen plasma." A fair reading of Lal's Progress Note is that Dr. Tawa was involved or, at a minimum, acquiesced in a treatment that called for an order discontinuing medication that Tawa had prescribed. And, contrary to Tawa's argument that Madias does not suggest elsewhere in his report that Tawa was involved in this decision, Madias's report

14

further attributes these decisions to Tawa in a section entitled "Was the treatment that Mr. Gentry received after his admission on November 14, 2008 by his health care providers including Dr. Tawa, Dr. Lai, and Angela Rowan NP-C, the expected management to be implemented by competent and responsible professionals?"

> Unfortunately, Mr Gentry's health care providers decided soon after his admission, and despite the persistence of atrial fibrillation, to stop the antithrombotic therapy in order to address by means of a kidney biopsy the possible cause of the patient's reduced renal function; this problem was unrelated to the patient's symptoms.

Madias's report states that he has experience treating and managing patients similarly situated with Gentry, i.e., those diagnosed with atrial fibrillation, and that he has "knowledge of the standard of care associated with the diagnosis and treatment of the illness and injury that Mr. Gentry suffered, including his atrial fibrillation, the need for anticoagulation, the risks of embolic strike, and management of kidney disease." He further states that in his Internal Medicine practice, he has "treated many patients with atrial fibrillation and uncontrolled hypertension," and that he has "knowledge of the risks involved when such patient's antithrombotic treatment is discontinued."

Madias's report further explains that the "consequences of discontinuation of antithrombotic therapy and the causes of cardiac embolism are well known within the specialty of Internal Medicine," and that "[a]ll of the concepts and opinions that I present are completely in the domain and expected knowledge of an internist

15

without additional training in cardiology or any other subspecialty." Finally, he notes that the "standard of care that apply to a subspecialist in Cardiology or Nephrology managing Mr. Gentry must satisfy or even exceed those that apply to a specialist in Internal Medicine. That is, the standard of care applicable to internist that do not have additional subspecialties such as Cardiology or Nephrology."

"Where a particular subject of inquiry is common to and equally developed in all fields of practice, and the prospective medical expert witness has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those which confronted the practitioner charged with malpractice, the witness is qualified to testify." *Rittger*, 332 S.W.3d at 558 (holding that neurologist/ professor of medicine was qualified to opine on the standard of care in case against emergency room physician who failed to diagnose stroke in pregnant patient, explaining that the fact that the patient "was pregnant when she experienced her stroke or that she presented herself in a emergency room setting does not require that [the expert] be a an obstetrician or emergency room physician," because he "is shown to be sufficiently competent and qualified to testify as to the care of patients with stoke as a complication of pregnancy-related toxemia"). When, according to the expert's report, the relevant standard of care is basic and not limited to any particular specialty, an expert is qualified if "actively participating in rendering medical care 'relevant to the claim,' which can be

16

demonstrated by a report showing the "injury involved was of the type [the expert] treated in his practice." *Padilla v. Loweree*, 354 S.W.3d 856, 864 (Tex. App.—El Paso 2011, pet. denied) (holding that orthopedic surgeon was qualified to opine on standard of care against gynecological surgeon because subject-matter of claim— i.e., positioning and padding of patients' extremities—is common to types of surgeries expert performs).

We disagree with Tawa that Madias's report and opinions are analogous to the expert's report and opinions "about the administrative decisions of the Defendant Hospital" that the court in *Brossard* held the expert was not qualified by experience or knowledge to opine about. 267 S.W.3d at 536. Rather, Madias's report and CV demonstrate that he has experience treating patients similarly situated with Gentry, and that the standards about which he opines are generally and well-known within his field of expertise. Tawa has not established that the trial court abused its discretion in finding Madias qualified to render an opinion regarding the applicable standard of care for Tawa.

### B. Adequacy of Report

### 1. Standard of Care

Tawa next argues that Madias's report "fails to specify an adequate standard of care for Dr. Tawa." Specifically, Tawa asserts that the "standard of care articulated in the report is ambiguous and conclusory because the report provides

17

no specific information about what Dr. Tawa should have done differently to meet the expected standard." Tawa cites *Kingwood Pines Hospital v. Gomez*, 362 S.W.3d 740, 743 (Tex. App.—Houston [14th Dist.] 2011, no pet.) for the proposition that Madias's report fails to include specific enough information about what an ordinarily prudent healthcare provider would have done, and *Kettle v. Baylor Medical Center at Garland*, 232 S.W.3d 832, 838–39 (Tex. App.—Dallas 2007, pet. denied) for the proposition that Madias's failure to include specific information about the time frame in which Tawa was "required to intervene" renders his articulation of the standard of care fatally deficient. Finally, Tawa argues that the "report impermissibly infers that the standards of care applicable to Dr. Lal also apply to Dr. Tawa."

The Gentrys respond that a physician can be liable for negligence in Texas based on a number of different acts or omissions, including choosing an inappropriate procedure, abandoning a patient, not obtaining informed consent, and not monitoring a patient's condition. Thus, they argue, "a physician can be held liable for omissions—an affirmative action is not required in every case." Additionally, they note that even the authority Tawa cites acknowledges that a full statement of the standard of care is not required, *Kingwood Pines Hosp.*, 362 S.W.3d at 748; all that is required is a statement sufficient to put the defendants on notice of the nature of the claims against them, which Madias's report does.

18

The Gentrys also contend that the *Kingwood Pines* case primarily relied upon by Tawa is distinguishable on its facts because it involved a conclusory articulation of a nonmedical standard of care not present in this case. The Gentrys argue that *Kettle*—the case Tawa cites for the proposition that Madias's report lacks requisite specificity about the timeframe for intervention—is likewise distinguishable. In that case, the court found the word "promptly" to be too ambiguous to articulate the standard of care that turned on when a procedure should have been performed to prevent a patient's death. According to the Gentrys, this case does not involve the same ambiguity concerns, given that the only possible time to intervene in this case would have been before cessation of antithrombotic therapy and the subsequent administration of vitamin K and fresh frozen plasma. Finally, the Gentrys assert that Tawa's contention that Madias's report imputes Lal's standard of care to Tawa is simply not supported by the actual contents of the Amended Report.

Madias's report contains the following articulation of the standard of care as it relates to Tawa:

> The accepted standard of medical care applicable to Dr. Tawa relates to this dual role of attending physician and that of internist caring for the patient. As the attending physician in the admission to the hospital of Mr. Gentry, Dr. Tawa is responsible for the entire care delivered to the patient by all healthcare providers, including Dr. Lal and Angela Rowan. Thus, Dr. Tawa must oversee the care delivered by the other providers and ensure that it is within the standard of care. Failure to fulfill this task leads to substandard care. Dr. Tawa also

19

treated Mr. Gentry in the role of internist caring for the atrial fibrillation and the management of this condition. A patient with atrial fibrillation of uncertain time as to the intuition of the arrhythmia and on Coumadin therapy should not discontinue all antithrombotic therapy unless clots in the atria are absent or active bleeding is present. The standard of care requires an internist to know that administration of fresh frozen plasma and vitamin K to reverse the anticoagulation caused by Coumadin therapy is very risky in a patient like Mr. Gentry since discontinuation of antithrombotic therapy may help to trigger the development of more clots in the atria.

It is important to recognize that the accepted standards of care for the diagnosis and management of the illness of Mr. Gentry are entirely dependent on his condition as a patient and are largely independent of the subspecialty (e.g. Cardiology or Nephrology) of the providers. Mr. Gentry had a medical condition typically managed by internists (specialty in Internal Medicine), and both Dr. Lal and Dr. Tawa were board certified in Internal Medicine.

The standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880; *Strom v. Mem'l Hermann Hosp. Sys.*, 110 S.W.3d 216, 222 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). Identifying the standard of care is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios*, 46 S.W.3d at 880. While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. *Id.*

Madias's report adequately set forth the standard of care. It states that, in managing atrial fibrillation such as Gentry's, antithrombotic therapy should not be discontinued unless certain conditions are present. This is sufficient to put Tawa on notice of the "specific conduct" that the Gentrys have called into question, and what he should have done differently. *Palacios*, 46 S.W.3d at 879; *e.g.*, *Menefee v. Ohman*, 323 S.W.3d 509, 519 (Tex. App.—Fort Worth, 2010, no pet.) (expert's statement that defendant-physician "owed the patient in an acute care setting the duty to immediate and sufficient medical response to her condition in order to prevent brain damage" was sufficient articulation of standard of review, in case alleging that physician was negligent in failing to immediately prescribe anticonvulsants).

The cases relied upon by Tawa are inapposite. In *Kingwood Pines*, a minor who was being evaluated for a psychiatric condition stemming from sexual abuse sued her doctor and hospital after she was sexually molested by another patient while in the hospital. 362 S.W.3d at 743–44. The court noted that her expert's report contained only conclusory statements "regarding the provision of a secure environment, the supervision of patients, and the prevention of harm to patients," without "indicat[ing] what an ordinarily prudent health care provider would do under the same or similar circumstances." *Id*. at 749. The court thus held that the articulation of the standard of care was insufficient as the expert merely stated

21

"that appellants did not provide a safe and secure environment for [the plaintiff], but do not specify how this should have been accomplished." *Id*. Given that Medias's report does indicate what course of action was called for, it does not lack specificity as the report in *Kingwood Pines* did.

*Kettle*, the other case cited by Tawa, is likewise distinguishable. In that case, the court affirmed the trial court's dismissal of a plaintiff's claim for failure to serve an adequate expert report as to plaintiff's claims against certain physicians. 232 S.W.3d at 638–39. Among other things, the court concluded that the expert's articulation of the standard of care was vague in that it did not specify what action should have been taken when:

> Cohen's opinion that all the physician-defendants collectively shared the same duty to diagnose and treat Kettle's condition "promptly" or "earlier" is also too vague and general to satisfy *Palacios*. It could be stated that every physician has a general duty to diagnose or treat medical conditions timely but that truism does not inform the physician-defendants what the standard specifically required them to do. It is conclusory.

*Id*. This analysis is simply not relevant to the Gentrys' claims, as it is clear when each action was taken that Madias's views as a breach of the standard of care, i.e., discontinuation of antithrombotic therapy and administration of fresh frozen plasma and vitamin K.

We find the facts presented here to be more analogous to *Springer v. Johnson*, 280 S.W.3d 322, 334 (Tex. App—Amarillo 2008, no pet.). In *Springer*,

22

the plaintiff was admitted to the hospital for cardiac surgery and, prior to that surgery, her attending physicians discontinued her anticoagulant therapy. 280 S.W.3d at 325. Three days later, she was discharged without receiving a prescription or instructions to resume her anticoagulant therapy. *Id*. She then suffered a stroke. *Id*. Similar to Madias's report, the expert in *Springer* opined that she should have been prescribed anticoagulation medication, and further that each doctor had a duty to coordinate her care to ensure that she received the proper medication, given the risk indicators:

> [The] expert report indicates [plaintiff] suffered from paroxysmal atrial fibrillation, an abnormal heart rhythm alternating between a normal heart rhythm, and she underwent a combined coronary bypass graft and aortic valve replacement while at Lubbock Heart Hospital. He opines that these two facts are clinical indicators establishing a compelling and absolute need for anticoagulation therapy using warfarin because (1) an aortic valve replacement significantly increased her risk of thromboembolism, i.e., clot formation in a blood vessel that breaks loose and is carried by the blood stream until it eventually plugs another blood vessel, and (2) her paroxysmal atrial fibrillation added to that risk. [The expert] further opines that [plaintiff] should have been prescribed warfarin and aspirin. He states that Springer, [plaintiff]'s cardiac surgeon, and Rizzo and Solis, her attending cardiologists, were under a duty to coordinate an appropriate plan for their patient's care which would have included coordinating care between themselves as well as employees and agents of Lubbock Heart Hospital. He further opines they were also under a duty to supervise anticoagulation management of Johnson utilizing a combination of warfarin and aspirin.

*Id*. at 331–32. The *Springer* court rejected the defendants' reliance on *Kettle* for the proposition that the standard of care was not sufficiently articulated. *Id*. at 333.

23

The court pointed out that the report at issue "states the standard of care, the clinical indicators that should have prompted treatment (patient with newly implanted aortic mechanical prosthesis and history of atrial fibrillation), and the treatment that should have been administered (warfarin therapy with a prescribed low dose aspirin) to satisfy the duty of care." *Id*. Here, Madias likewise states the clinical indicators (atrial fibrillation of uncertain time) and the treatment that should have been administered (continued antithrombotic therapy).

Finally, we agree with the Gentrys that Tawa's assertion that Madias's report does not differentiate between the standards of care applicable to Tawa and Lal is not supported by the contents of the actual report. While Madias states that the standards applicable to both Tawa and Lal are known and applicable to internists generally without regard to their additional specialties, his report clearly articulates a separate standard for both Tawa and Lal individually, and then states that they had an obligation to coordinate their treatment of Gentry.

The trial court did not abuse its discretion in determining that Madias's report adequately articulated a standard of care related to Tawa.

### 2. Causation

Tawa next argues that Madias's report "fails entirely to discuss a causal relationship between Dr. Tawa's conduct and Mr. Gentry's embolic CVA." Specifically, he argues that "the report does not state *or even suggest* that Mr.

24

Gentry would not have suffered a stroke if he had remained on antithrombotic therapy." Tawa cites several cases for the proposition that a report that only sets forth causation in a conclusory fashion is not sufficient. *Tenet Hosp. LLC v. Love*, 347 S.W.3d 743, 755 (Tex. App.—El Paso 2011, no pet.) (expert opinion that if defendant hospital "had a pulmonologist or critical care specialist on call and available to see and treat this patient or had transferred this patient before her condition worsened, [patient] would more likely than not be alive today" was impermissibly conclusory); *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.) (expert's mere assertion that patient would have survived was conclusory when report did not explain causal relationship between patient's death and alleged omissions by hospital, including whether treatment would have or could have been effective).

The Gentrys contend that Tawa's argument does not represent a fair reading of Madias's report. They assert that "when one views the report in total, it is clear that causation of Mr. Gentry's injuries is sufficiently addressed and connects the actions and omissions of Dr. Tawa to those injuries."

Madias's report states that the care Gentry received at North Cypress Medical Center by Tawa, Rowan, and Lal was "below the standard of ordinary care, and that it was a proximate cause of his cerebrovascular accident (embolic stroke) that resulted in hemiplegia with permanent and severe neurologic

25

disability." His report then goes on to explain the underlying medical basis for his opinion:

> The cause of the CVA was acute cerebral ischemia with brain infarction within the right side of the brain that resulted from embolism of blood clots that originated in the left cardiac chambers (i.e., left atrium). The consulting neurologist, the CT head, the Brain MRI, all support that cardiac embolism was the cause of the patient's CVA. The relative normalcy of the Duplex carotid evaluation is also consistent with embolism as the basis for the CVA. Because patients with atrial fibrillation are at a much higher risk for embolic stroke, it is important for them to receive antithrombotic therapy unless there is active bleeding or the absence of clots has been confirmed. In this case, the discontinuation of Coumadin and administration of FFP and vitamin K was the most likely cause of the formation of clots in Mr. Gentry's atria and his subsequent CVA.

Madias's report contains additional information about (1) the source of Gentry's blood clots leading to his CVA, (2) the substantial risk and usual course of treatment for patients with atrial fibrillation associated with substantial hypertension and left atrial enlargement, (3) why the actions of each defendant healthcare provider were negligent and proximately caused of Gentry's stroke, and (4) why a kidney biopsy was not indicated, given Gentry's symptoms. Contrary to Tawa's assertions, Madias's report clearly states his opinion that the discontinuation of Coumadin and infusion of vitamin K and fresh frozen plasma was the most likely cause of Gentry's stroke. The cases Tawa cites are inapposite because unlike the conclusory reports in those cases, Madias's report does "explain

26

the basis of the expert's statements regarding causation and link his conclusions to the facts." *Love*, 347 S.W.3d at 754.

The trial court did not abuse its discretion in determining that Madias's report adequately articulated a causal link between Tawa's care and Gentry's stroke. Because we have concluded that Madias possessed the required qualifications to prepare an expert report opining on Tawa's care, and because we have concluded Madias's report meets the statutory requirements, we overrule appellants' first issue complaining that the trial court abused its discretion in failing to grant Tawa's motion to dismiss.

## ROWAN

In appellants' second issue, they argue that the trial court abused its discretion in failing to find Madias's report deficient as it relates to Rowan (and to the vicarious liability of Houston Interventional Cardiology for Rowan's care). Specifically, Rowan argues that Madias's report is deficient because (1) he is "not qualified to render an opinion regarding the standard of care applicable to nurse practitioners," (2) it "fails to specify a standard of care applicable to Ms. Rowan," and (3) "fails entirely to dismiss the causal relationship between Ms. Rowan's alleged breach and Mr. Gentry's embolic CVA."

### A. Qualification

Rowan argues that Madias is not qualified to testify on the standard of care for a nurse practitioner. She relies on *HB Properties L.P. v. Cox*, No, 02-09-00111-CR, 2009 WL 3337190 (Tex. App.—Fort Worth Oct. 5, 2009, pet. denied) (mem. op.), which held that a doctor board certified in internal medicine was not qualified to render an opinion on the standard of care applicable to nurses. In that case, although the expert's CV reflected experience and expertise in internal medicine and as a medical administrator, nothing in his report or CV demonstrated familiarity with the acceptable standard of care for nurses. *HB Props. L.P.*, 2009 WL 3337190, at *4 (holding trial court abused its discretion in failing to grant motion to dismiss because "[t]hough [expert] is not automatically disqualified from giving an expert opinion regarding the accepted standard of care for HN's nurses simply because he is an internal medicine physician instead of a nurse, we may not through inferences or otherwise fill in the gaps in his report where he fails to detail why or how he is qualified to opine about the applicable standard of care for HN's nurses."). Rowan contends that Madias's report similarly fails to demonstrate a familiarity with the standard of care applicable to a nurse practitioner working in cardiology.

The Texas Civil Practice and Remedies Code sets forth the criteria for an expert witness against a health care provider such as Rowan:

28

(b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE § 74.402(b).

Applying this standard, the courts of appeals have consistently required a physician-expert proffering an opinion on the applicable standard of care of a nonphysician to affirmatively demonstrate experience and familiarity with the standard of care for the nonphysician's field.

> When a physician fails to state in his expert report or affidavit that he has knowledge of the standard of care applicable to the specific types of health care providers involved in the claim, or that he has ever worked with or supervised the specific types of health care providers involved in the claim, the physician is not qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. However, if the physician states he is familiar with the standard of care for both nurses and physicians, and for the prevention and treatment of the illness, injury, or condition involved in the claim, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. Further, if a physician

29

states he is familiar with the standard of care and responsibilities and requirements for physician's assistants, and he has worked with, interacted with, and supervised physician's assistants, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers.

*Baylor Med. Center at Waxahachie v. Wallace*, 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.) (citations omitted). *Compare Simonson v. Keppard*, 225 S.W.3d 868, 873 (Tex. App.—Dallas 2007, no pet.) (physician not qualified to opine on standard of care for nurse practitioner because his report does not "state that he either has knowledge of the standard of care applicable to nurse practitioners or that he has ever worked with or supervised nurse practitioners) and *Jones v. Ark-La-Tex Visiting Nurses, Inc.*, 128 S.W.3d 393, 396 (Tex. App.—Texarkana 2004, no pet.) (physician not qualified to opine on standard of care for nurse because his "report fails to state [his] qualifications to give the standard of care for nurses monitoring a patient in a home healthcare setting"), *with San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 813 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (physician qualified to opine on standard of care for nurse because his "report stated that he is familiar with the standard of care for both nurses and physicians for the prevention and treatment of decubitus ulcers").

Madias's report does not profess any knowledge about the standard of care applicable to nurse practitioners. He does not claim to have experience training or supervising nurse practitioners or provide any other basis for the trial court to

30

conclude that he was familiar with such standard. In contending that Madias is qualified to opine about the standard of care applicable to Rowan, the Gentrys only point to evidence that Madias is "familiar with the management of patients with medical conditions similar to Mr. Gentry," and ask us to conclude that he "therefore would be familiar with the standard of care as it relates to nurses managing such patients." Neither the text of section 74.402 nor the cases interpreting it allow us to make such an assumption.

Because nothing in Madias's report demonstrates that he is familiar with the standard of care applicable to nurse practitioners, we hold that the trial court abused its discretion by denying Rowan's motion to dismiss (and Houston Intervention Cardiology's motion to dismiss as it relates to vicarious liability for Rowan's care of Gentry). We thus sustain appellants' second issue.

### B.    Attorneys' Fees

Rowan and Houston Intervention Cardiology request that we reverse the trial court's order denying their motion to dismiss the Gentrys' claims related to Rowan's care and remand to the trial court with instructions to award to them reasonable attorneys' fees and costs under section 74.351 of the Texas Civil Practice and Remedies Code. The Gentrys argue that an award of attorneys' fees under section 74.351 is not appropriate, even if Madias's report is deficient, because it is not so deficient that it should be considered "no report at all."

31

Section 74.351 provides that, if a timely expert report is not filed, upon motion, the court "*shall . . .* enter an order that: . . . awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider." TEX. CIV. PRAC. & REM. CODE § 74.351. This "automatic attorney's fees sanction comes into play when a timely but deficient expert report has been filed." *Hightower v. Baylor Univ. Med. Ctr.*, 348 S.W.3d 512, 522 (Tex. App.—Dallas 2011, pet. denied). Thus, appellants Rowan and Houston Interventional Cardiology are entitled to an award of reasonable attorneys' fees and costs incurred related to claims premised on care provided by Rowan.

## CONCLUSION

We affirm the trial court's order denying appellants Tawa and Houston Interventional Cardiology's motion to dismiss claims related to Tawa's care of Gentry. We dismiss the Gentrys' claims against appellants Rowan and Houston Interventional Cardiology (only as to vicarious liability claims related to Rowan's care of Gentry). We remand to the trial court for an award of reasonable attorneys' fees and costs to Rowan and Houston Interventional Cardiology related to the dismissed claims and for further proceedings.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Brown.