

# IN THE
# TENTH COURT OF APPEALS

### No. 10-13-00248-CV

**NAVARRO HOSPITAL, L.P. D/B/A**
**NAVARRO REGIONAL HOSPITAL,**

                                     **Appellant**

 **v.**

**CHARLES WASHINGTON AND GWENDOLYN**
**WASHINGTON, EACH INDIVIDUALLY AND AS**
**NEXT FRIENDS OF CHARLES DONELL WASHINGTON,**
                                     **Appellees**

### From the 13th District Court
### Navarro County, Texas
### Trial Court No. D12-21439 CV

## MEMORANDUM OPINION

In this appeal, appellant, Navarro Hospital, L.P. d/b/a Navarro Regional Hospital, complains about the trial court's denial of its motion to dismiss a health-care liability claim brought by appellees, Charles Washington and Gwendolyn Washington, each individually and as next friends of Charles Donell Washington ("Donell"). In two issues, appellant challenges appellees' expert reports as not constituting a good faith

effort.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West Supp. 2013).  We affirm.

## I.  BACKGROUND

In their original petition, appellees asserted health-care liability claims against appellant and two doctors, Douglas B. Hibbs, M.D. and James Goodman, M.D., among others.[1]  In particular, appellees alleged that Donell was an accomplished musician "who had a full and active life" when he was admitted to Navarro Regional Hospital on July 13, 2010.  At the time, Donell complained of difficulty breathing, dizziness, nausea, vomiting, and pain in his throat and right ear.  Appellees noted that Donell appeared depressed and had difficulty with verbal expression when he was admitted to the hospital.  Nevertheless, Donell was stable at that time.  Dr. Hibbs was the attending physician, and he ordered that Donell be given IV fluids, insulin, and medications to address his agitation and restlessness.

Donell was taken to the ICU, and he remained there the following day.  Doctors noted that Donell became increasingly agitated and unresponsive to verbal stimuli.  They also observed increases in Donell's blood pressure and heart rate.

At approximately 2:25 a.m. on July 15, 2010, Donell's heart rate and oxygen saturation dropped suddenly, and he was placed on 100% oxygen via mask.  Five

---

[1] Drs. Hibbs and Goodman are not parties to this appeal.

minutes later, Donell's heart rate decreased to 39, and a Code Blue was called. Doctors commenced chest compressions, and an ambubag was used to ventilate Donell.

Drs. Hibbs and Goodman tried multiple times to intubate Donell, but they were unsuccessful in their attempts. According to appellees, no one tried to use the "'difficult airway' equipment that is standard and sometimes necessary to achieve intubation of a patient such as Donell." Appellees further asserted that this "equipment was unavailable or was otherwise not brought to the room. The responsibility for having such equipment and assuring hospital staff bring it to the room rests with the corporate defendants."

Approximately forty-five minutes after the Code Blue was called, a Dr. Stevener arrived and successfully intubated Donell. However, by the time that he was intubated, Donell suffered extensive and permanent brain damage.[2] Appellees argued that Donell's brain damage was caused by "the needless delay in getting Donell ventilated."

Based on these facts, appellees asserted negligence and gross-negligence causes of action against Drs. Hibbs and Goodman and appellant, among others. With respect to appellant, appellees contended that appellant "failed to have the difficult airway equipment readily available, and failed to have and/or enforce adequate policies related to such equipment. These failures resulted in Donell needlessly suffering severe, permanent brain damage." Appellant responded by filing an original answer denying

---

[2] At the hearing on appellant's motion to dismiss, counsel for appellees stated that Donell is now deceased.

each of the allegations contained in appellees' original petition and asserting special exceptions and numerous affirmative defenses.

Appellees subsequently filed expert reports from Edward Panacek, M.D. and Arthur S. Shorr, MBA, FACHE. Appellant filed objections to both expert reports and a motion to dismiss appellees' claims. Thereafter, the trial court conducted a hearing on appellant's motion to dismiss and ultimately denied the motion. The trial court also signed an order deeming appellees' expert reports adequate. This interlocutory appeal followed. *See id.* § 51.014(a)(9) (West Supp. 2013) (permitting the appeal of an interlocutory order from a district court that "denies all or part of the relief sought by a motion under Section 74.351(b)").

## II. STANDARD OF REVIEW & APPLICABLE LAW

We review a trial court's denial of a motion to dismiss under section 74.351 for an abuse of discretion. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

Section 74.351 of the Texas Civil Practice and Remedies Code provides that within 120 days of filing a health-care liability claim, a claimant must serve a curriculum vita and one or more expert reports regarding every defendant against

whom a health-care claim is asserted. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *see also Hillcrest Baptist Med. Ctr. v. Payne*, No. 10-11-00191-CV, 2011 Tex. App. LEXIS 9182, at *6 (Tex. App.—Waco Nov. 16, 2011, pet. denied) (mem. op.). The expert report must contain,

> a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see Palacios*, 46 S.W.3d at 877. If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in [section 74.351(r)(6)]." *Wright*, 79 S.W.3d at 51-52; *see Palacios*, 46 S.W.3d at 878.

To constitute a "good faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Wright*, 79 S.W.3d at 52-53 (noting that "magical words" are not necessary to provide a fair summary of the standard of care, breach of that standard, and causation); *see Palacios*, 46 S.W.3d at 879 ("A report that merely states the expert's conclusions about the standard of care, breach, and causation does not

fulfill these two purposes. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements."). The trial court should look no further than the report itself, because all the information relevant to the inquiry should be contained within the document's four corners. *Wright*, 79 S.W.3d at 52 (citing *Palacios*, 46 S.W.3d at 878).

An expert report, however, does not need to marshal all of the plaintiff's proof; it may be informal, and the information presented need not meet the requirements of evidence offered in summary-judgment proceedings or in trial. *See Spitzer v. Berry*, 247 S.W.3d 747, 750 (Tex. App.—Tyler 2008, pet. denied); *see also Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 496 (Tex. App.—Dallas 2010, no pet.). Moreover, "[e]xpert reports can be considered together in determining whether the plaintiff in a health[-]care liability action has provided adequate expert opinion regarding the standard of care, breach, and causation." *Salais v. Tex. Dep't of Aging & Disability Servs.*, 323 S.W.3d 527, 534 (Tex. App.—Waco 2010, pet. denied); *see Walgreen Co. v. Hieger*, 243 S.W.3d 183, 186 n.2 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i).

### III.   APPELLEES' EXPERT REPORTS

In its first issue, appellant contends that the trial court erred in denying its motion to dismiss because appellees' expert reports failed to establish the standard of care and alleged departures from the standard of care. More specifically, appellant

argues that: (1) Dr. Panacek and Shorr are not qualified to render opinions as to the standards of care and the alleged departures from the standards of care; (2) Dr. Panacek's report fails to adequately set forth the applicable standard of care; (3) Dr. Panacek's opinions about the breach of the standard of care are inadequate and based on speculation and conjecture; and (4) Shorr's report fails to specify the applicable standard of care and breach. In its second issue, appellant asserts that Dr. Panacek and Shorr are unqualified to opine as to causation and that their reports do not adequately explain the causation element.

**a.      The Qualifications of Experts in Health-Care Liability Claims**

Section 74.351(r)(5) of the Texas Civil Practice and Remedies Code provides that an "expert" in a health-care liability claim is:

> (B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402;
>
> (C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence . . . .

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(B)-(C). Section 74.402 states the following, in pertinent part:

> (b) In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of

whether the health care provider departed from accepted standards of care only if the person:

   (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time, the testimony is given or was practicing that type of health care at the time the claim arose;

   (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

   (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

   (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

   (2) is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(b)-(c) (West 2011). Moreover, section 74.402(a) describes the following as

"practicing health care":

   (1) training health care providers in the same field as the defendant health care provider at an accredited education institutional; or

   (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.

*Id.* § 74.402(a).

In light of the foregoing statutes, the Texas Supreme Court has stated that a professional need not be employed in the particular field about which he is testifying so long as he can demonstrate that he has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify him to give an opinion on that subject. *Broders v. Heise*, 924 S.W.2d 148, 153-54 (Tex. 1996); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402 (West 2011) (listing the requirements for an expert to be considered qualified in a suit against a health-care provider); *see also* TEX. R. EVID. 702 (allowing experts to testify based on their "knowledge, skill, experience, training, or education"). "[W]hen a party can show that a subject is substantially developed in more than one field, testimony can come from a qualified expert in any of those fields." *Broders*, 924 S.W.2d at 154.

Qualifications of an expert must appear in the expert reports and curriculum vitae and cannot be inferred. *See Salais*, 323 S.W.3d at 536; *see also Estorque v. Schafer*, 302 S.W.3d 19, 26 (Tex. App.—Fort Worth 2009, no pet.) (citing *Olveda v. Sepulveda*, 141 S.W.3d 679, 683 (Tex. App.—San Antonio 2004, pet. denied)). Analysis of the expert's qualifications under section 74.351 is limited to the four corners of the expert reports and the expert's curriculum vitae. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 (Tex. 2008) (considering an expert's curriculum vita and report in determining whether the expert was qualified to opine

about plaintiff's negligent-credentialing cause of action); *Polone v. Shearer*, 287 S.W.3d 229, 238 (Tex. App.—Fort Worth 2009, no pet.); *see also Lewis v. Funderburk*, No. 10-05-00197-CV, 2008 Tex. App. LEXIS 9761, at *6 (Tex. App.—Waco Dec. 31, 2008, pet. denied) (mem. op.).

Merely being a physician is insufficient to qualify as a medical expert. *See Broders*, 924 S.W.2d at 152; *see also Hagedorn v. Tisdale*, 73 S.W.3d 341, 350 (Tex. App.—Amarillo 2002, no pet.) ("Every licensed doctor is not automatically qualified to testify as an expert on every medical question."). But we defer to the trial court on close calls concerning an expert's qualifications. *See Larson v. Downing*, 197 S.W.3d 303, 304-05 (Tex. 2006); *see also Broders*, 924 S.W.2d at 151 ("The qualification of a witness as an expert is within the trial court's discretion. We do not disturb the trial court's discretion absent clear abuse.").

### 1. Dr. Panacek's Qualifications

On appeal, appellant complains that Dr. Panacek is not qualified to render an opinion in this case because he failed to explain his qualifications for rendering an opinion about the equipment which a hospital should make available in ICU and ER units, as well as "protocols, policies and procedures to assure that medical personnel and staff are aware of and trained to utilize" such equipment. As noted above, this case involved a patient that required advanced airway management and equipment in

response to a Code Blue. In the qualifications section of his expert report, Dr. Panacek stated the following:

> I am a physician licensed to practice medicine by the state of California. I received the MD degree at the University of South Alabama College of Medicine in Mobile AL in 1981. I am a Diplomate of the American Board of Internal Medicine, the National Board of Medical Examiners, the American Board of Emergency Medicine and am a Diplomate in Critical Care Medicine. I am an instructor in Advanced Cardiac Life Support, and Advanced Trauma Life Support. I am a past Program Director of the Emergency Medicine Residency program at the University of California Davis Medical Center in Sacramento CA. I am a Professor of Emergency Medicine at that same facility. My CV is attached to this report and is incorporated by reference. I have extensive experience in establishing and maintaining airways in patients, responding to Code Blues, and using standards of care related to airway management during Code Blue situations in the hospital setting, and these standards of care are common to internal medicine, emergency medicine, and critical care medicine. I am familiar with the medical treatment of a patient similar to Charles "Donell" Washington in 2010 and am qualified by training and experience to render opinions regarding the appropriateness of his medical treatment.

The language above demonstrates that Dr. Panacek is a practicing doctor with a medical license from California and describes his expertise in critical-care and emergency medicine, especially with regard to airway management and responding to Code Blue situations—the type of expertise involved in the claims asserted in this case. Additionally, Dr. Panacek opines that he is familiar with the medical treatment of a patient similarly situated as Donell in this case. As such, Dr. Panacek asserts that he is qualified to render his opinion in his expert report based on experience, as well as knowledge, skill, and education. Other language in his expert report, including his

description of the standards of care involved in this case, indicates that he is familiar with the actions and equipment necessary for the advanced airway management involved here. Therefore, based on the language contained in Dr. Panacek's expert report, we cannot say that the trial court clearly abused its discretion by implicitly concluding that Dr. Panacek is qualified to give an opinion on the subject matter involved in this case. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402; *see also Broders*, 924 S.W.2d at 153.

### 2. Shorr's Qualifications

Appellant also contends that Shorr is unqualified to opine on the standard of care and causation in this case. In his report, Shorr states that he is Board Certified in Hospital and Healthcare Administration and is a Fellow of the American College of Healthcare Executives. He further states that he has worked as a healthcare administrator for forty years, of which includes a sixteen-year stint in senior executive management of acute-care hospitals. Additionally, Shorr recounts numerous executive and academic positions he has held in the healthcare industry. Shorr also notes that he has published numerous articles in peer-reviewed professional healthcare-administration journals and that he has authored a textbook on administrative issues in the healthcare industry. Furthermore, Shorr's report reflects that he has been a provider of consulting services to physicians and hospitals, "first as Arthur S. Shorr & Associates,

Inc.: Consultants to Healthcare Providers, and currently as Shorr Healthcare Consulting."

Based on Shorr's extensive experience in healthcare administration, and given that Shorr is Board Certified in Hospital and Healthcare Administration and provides consulting services to hospitals regarding administration services, we conclude that Shorr is qualified to opine as an expert as to the standards of care and the corresponding departures from the standards of care involving appellant's alleged failure to have difficult airway equipment available and appropriate policies in place to ensure that such equipment is available to treating physicians and that hospital personnel are trained how to use such equipment. *See id.* § 74.402(a)-(c); *see also* TEX R. EVID. 702; *Broders*, 924 S.W.2d at 153-54. However, we do agree with appellant that Shorr, a non-physician, is not qualified to opine as to causation in this matter. *See id.* § 74.403(a) (West 2011) (stating that only a physician is qualified to render causation opinions in health-care liability claims); *see also Petty v. Churner*, 310 S.W.3d 131, 134 (Tex. App.—Dallas 2010, no pet.); *Hieger*, 243 S.W.3d at 186 n.2. We will now address the adequacy of the expert reports.

**b.     Adequacy of the Expert Reports**

With regard to the standard of care applicable to appellant, Dr. Panacek stated the following:

> Airway management is one of the most critically important skills for an
> emergency or critical care practitioner to master because failure to secure

an adequate airway can quickly lead to death or disability. Endotracheal intubation using rapid sequence intubation (RSI) is the cornerstone of emergency airway management.

. . . .

The relevant standards of care for hospitals treating Donell Washington during the admission of July 13, 2010 are such that the hospital must have specialized intubation equipment immediately available in all ICU and ER units, as well as available to each code blue. Such equipment includes endotracheal tubes of various sizes, a laryngoscope with blades of various sizes, Laryngeal Mask Airways, and naso- and oro-pharyngeal airways. Difficult airway equipment must be quickly available as well. Further, minimal standards of care require that the hospital have and/or enforce adequate protocols, or policies and procedures to assure that medical personnel and staff are aware of and trained to utilize this specialized intubation equipment during code situations so that no patient goes without oxygen for an inordinate amount of time.

Thereafter, Dr. Panacek described how appellant departed from the applicable standard of care and caused Donell's injuries. Specifically, Dr. Panacek noted that appellant's actions,

fell below applicable standards of care by failing to have specialized intubation equipment immediately available for use on Donell Washington. Further, they fell below applicable standards of care by failing to have, or failing to enforce, protocols, polices, and procedures to assure that medical personnel and staff were aware and trained to utilize specialized intubation equipment during code situations. Had such equipment been available it more likely than not would have been used on Donell Washington at the beginning of his Code Blue.

And as a result of appellant's alleged departures from the applicable standards of care,

Dr. Panacek stated the following, among other things:

Had applicable standards of care been used on Donnell Washington, the hospital would have had the equipment identified above in a crash cart on

the unit where Donell Washington was located. When the Code Blue was called the crash cart would have been rolled into the room very quickly by the nurses as the Code Team was arriving. Drs. Goodman and Hibbs would have taken steps to assure that an adequate airway was established and maintained during the Code Blue. These physicians would have intubated Donell Washington as soon as possible after they arrived at Washington's bedside by taking a laryngoscope from the crash cart, putting the appropriate blade on it, and then putting the blade into the patient's mouth and into his larynx, visualizing his vocal cords and inserting the plastic endotracheal tube into the patient's throat. . . . At that point, these physicians should have gone to an LMA or naso- or oro-pharyngeal mask. An LMA is simply a tube with an inflatable mask on one end that is inserted into the patient's throat to achieve a seal over the tracheal opening so that oxygen can be forced into the patient's lungs. Almost certainly, these physicians would have been able to adequately ventilate this patient at that point. If for some reason, they could not accomplish this, then the physicians should have used a scalpel and made an incision in the anterior surface of Washington's neck, identified and cut through the cricothyroid membrane and intubated the patient through this opening. At this point, Washington would have been ventilated adequately until a definitive airway could be established. Brain damage due to lack of oxygen would more likely than not have been avoided.

In order to comply with applicable standards of care, CMS/Community Health Systems d/b/a Navarro Regional Hospital and the operator of that hospital, which I understand to be Quorum Health Resources, would have had specialized intubation equipment, to specifically include the intubation equipment listed above, immediately available in the ICU unit where Mr. Washington was being maintained at the time the Code Blue was called. Moreover, Navarro Regional Hospital should have had and/or enforced protocols or policies and procedures assuring that the medical personnel and staff (including Drs. Goodman and Hibbs) were aware of and trained to utilize this specialized intubation equipment during a Code Blue. Had this occurred, then all of the equipment listed above would have been physically present in Donell Washington's room and available for use by Drs. Goodman and Hibbs. Unfortunately, the hospital failed to take these actions, thereby proximately causing Mr. Washington's injury.

It is my opinion beyond a reasonable medical probability, based on my training and education and experience, that the negligent acts of Dr. Goodman, Dr. Hibbs, and Navarro Regional Hospital . . . outlined above were each a proximate cause of Mr. Washington's profound brain damage and related sequelae. It is well accepted in the medical community at large that the brain requires a constant flow of oxygen to function normally. When the flow of oxygen is cut-off—and in a patient who is unconscious and not breathing—the blood oxygen levels drop. At a certain point, the low oxygen state causes the cells of the body to go into anaerobic respiration, rather than aerobic respiration based on the oxygen supply. This produces lactic acid as a by-product of anaerobic respiration. The lactic acid builds up and brain cells begin to die. A hypoxic-anoxic injury occurs when the flow of blood is disrupted, essentially starving the brain and preventing it from performing vital biomechanical processes. With complete cessation of oxygenation, the cells of the brain begin to die in approximately 4 to 6 minutes. Brain-cell death is not reversible. When oxygen deprivation is severe enough, a profound hypoxic-anoxic brain injury results via this mechanism of injury. This is what happened to Donell Washington as a result of his being without an adequate airway for approximately 46 minutes during the Code Blue. Subsequent workup confirmed this diagnosis of hypoxic-anoxic encephalopathy. Specifically, an MRI on July 16, 2010 showed extensive cortical and deep gray abnormalities, and overall configuration and findings suspicious for hypoxic ischemic injury or global anoxic event. On July 28, 2010, CT of Mr. Washington's head showed abnormalities involving bilateral lentiform and caudate nuclei consistent with anoxic brain injury, with subacute petechial hemorrhage. EEG findings were deemed to show a pattern that was "consistent with our diagnosis of hypoxic encephalopathy." The brain damage is permanent and quite severe.

Shorr, on the other hand, mentioned that appellant is directly responsible for providing safe and effective healthcare services and are liable for the negligence of Drs. Goodman and Hibbs. Shorr stated that the relevant standards of care for hospitals are to ensure that its staff are competent and adequately trained to appropriately manage Donell's airway during a Code situation and that it should have and/or enforce

protocols, policies, or procedures to assure that medical personnel and staff "are aware of and trained to utilize this specialized intubation equipment during code situations so that no patient goes without oxygen for an inordinate amount of time." In support of his opinion on the standard of care, Shorr cites to numerous regulations and accreditation standards for hospitals, including those pertaining to hospital accountability for patient care, hospital requirements to have supplies and equipment needed for patient care readily available, duties of hospital staff to recognize and respond to changes in a patient's condition, and duties of the hospital to ensure that all staff are competent to carry out patient treatment.

After reviewing the four corners of the proffered expert reports, we conclude that the reports inform appellant of the specific conduct that appellees have called into question—appellant's failure to: (1) have specialized intubation equipment readily available at the time the Code Blue was called; and (2) have or enforce protocols, policies, or procedures for ensuring that personnel are aware of and trained to utilize such equipment—and provide the trial court with a basis to conclude that the claims have merit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Wright*, 79 S.W.3d at 52-53; *Palacios*, 46 S.W.3d at 879; *see also Salais*, 323 S.W.3d at 534; *Hieger*, 243 S.W.3d at 186 n.2. And to the extent that appellant complains that certain aspects of the expert reports are deficient, we emphasize that the reports need not marshal all of appellees'

proof or meet the same requirements as evidence offered in summary-judgment proceedings or in trial. *See Bakhtari*, 317 S.W.3d at 496; *see also Spitzer*, 247 S.W.3d at 750.

Based on the foregoing, we cannot say that the trial court acted in an arbitrary or unreasonable manner or without reference to guiding rules and principles when it denied appellant's motion to dismiss. *See Walker*, 111 S.W.3d at 62; *see also Downer*, 701 S.W.2d at 241-42. Accordingly, we cannot conclude that the trial court abused its discretion in denying appellant's motion to dismiss. *See Wright*, 79 S.W.3d at 52; *see also Palacios*, 46 S.W.3d at 875. We overrule both of appellant's issues on appeal.

## IV. CONCLUSION

Having overruled both of appellant's issues on appeal, we affirm the judgment of the trial court.


AL SCOGGINS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed May 8, 2014
[CV06]